CONCERNED CITIZENS OF BRUNSWICK COUNTY TAXPAYERS ASSO-
CIATION, RAYMOND COPE AND ROYAL WILLIAMS v. STATE OF
NORTH CAROLINA EX REL. S. THOMAS RHODES, SECRETARY OF THE
DEPARTMENT OF NATURAL RESOURCES AND COMMUNITY DEVELOPMENT v.
HOLDEN BEACH ENTERPRISES, INC.

No. 401PA89

(Filed 12 June 1991)

1. **Easements § 6.1 (NCI3d) — prescriptive easement — substantial identity of easement — improper test applied by trial court**

   In an action to determine whether an easement by prescription had been established by the public's use of a pathway along and across the shifting dunes of an area at Holden Beach, the trial court erred in failing to make any determination as to whether there was substantial identity of the easement claimed and erred in determining only that plaintiffs had failed to show the existence of a "single" or the "same" definite and specific line of travel for the prescriptive period.

   **Am Jur 2d, Waters §§ 354, 391.**

2. **Easements § 6.1 (NCI3d) — prescriptive easement — substantial identity of easement — factors to be considered — vulnerability of road to forces of nature**

   In determining whether an easement has substantially retained its identity over time, factors which the fact finder may consider include the vulnerability of the road traveled due to forces of nature, and this is particularly pertinent where the easement claimed is across windswept, shifting sands which are subject to ocean storms, since, to require that there be no change, or at most only very slight change, in a road traveled by many for the prescriptive period over an area highly vulnerable to the forces of wind, shifting sand, ocean tide, flooding from ocean or sound, etc. would effectively bar the acquisition of a prescriptive easement in many locales of the coastal area of North Carolina.

   **Am Jur 2d, Waters §§ 354, 391.**

CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES

[329 N.C. 37 (1991)]

3. **Easements § 6.1 (NCI3d)— prescriptive easement—public's access to beach—use continuous and uninterrupted**

The trial court erred in concluding that defendant interrupted the use of the pathway in question by the general public in a manner that caused that use not to be continuous and uninterrupted where the evidence tended to show that defendant put telephone poles, cables, and gates across the pathway, but as defendant's efforts to prevent unauthorized passage through the property increased, so did the acts of the public to assert its claim to the use of the roadway by disregarding, removing, and destroying . the barricades; moreover, where the claim was by the public over the shifting sands of a barrier island seldom visited by anyone on a daily basis and particularly during times of bad weather, the use need only be more or less frequent according to the purpose and nature of the easement—to reach the inlet and seashore for fishing and recreational use—that is, often enough and with such regularity as to give the owner notice that the users were asserting a claim of right to use the route.

**Am Jur 2d, Waters §§ 354, 391.**

Justice MITCHELL dissenting.

ON discretionary review pursuant to N.C.G.S. § 7A-31 of a decision of the Court of Appeals, 95 N.C. App. 38, 381 S.E.2d 810 (1989), which affirmed a judgment entered for defendant by *Briggs, J.,* at the 9 November 1987 Civil Session of Superior Court, BRUNSWICK County. Heard in the Supreme Court 12 April 1990.

*Maxwell & Hutson, P.A., by James B. Maxwell, for plaintiff-appellants; and Lacy H. Thornburg, Attorney General, by Daniel F. McLawhorn, Special Deputy Attorney General, and J. Allen Jernigan, Assistant Attorney General, for intervenor-plaintiff-appellant.*

*Murchison, Taylor, Kendrick, Gibson & Davenport, by Vaiden P. Kendrick and Barbara J. Sullivan, for defendant-appellee Holden Beach Enterprises.*

MEYER, Justice.

In this case, we once again face the question of whether there was sufficient evidence of the establishment of an easement by

CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES

[329 N.C. 37 (1991)]

prescription by the public's use of a pathway along and across the shifting dunes of an area on the Outer Banks of North Carolina. The area in question is privately owned but over the years has been crossed by the public seeking access to the ocean strand and inlet for fishing and recreation. A portion of the prescriptive easement sought to be established is alleged to be sufficiently similar to a road marled and paved some years later across the same lands such that the public has acquired a right to the use and enjoyment of that paved road. A collateral issue is whether the evidence supported the trial judge's conclusion that, from time to time, defendant had barred public use of the roadway so as to interrupt the continuity of the use over the period of time required to establish an easement by prescription. With regard to the issue of the sufficiency of the evidence of the establishment of an easement by prescription, we conclude that the trial judge employed an erroneous standard in reaching his determination that there was insufficient evidence. We also address the collateral issue regarding interruption of the public's continuity of use for the requisite period and conclude that the evidence does not support the trial judge's finding of fact and conclusion of law that defendant had successfully interrupted adverse use by the public so as to defeat the establishment of the easement by prescription. We remand this case for a new trial on the merits employing the proper standard as to the sufficiency of the evidence to establish an easement by prescription.

On 13 August 1986, plaintiffs Concerned Citizens of Brunswick County Taxpayers Association and two individuals initiated this action after defendant erected a guardhouse in July 1985 blocking public access over a roadway crossing defendant's property. Plaintiffs sought to have this roadway declared a public right-of-way by virtue of prescriptive use. In the alternative, plaintiffs alleged that defendant Holden Beach Enterprises, Inc., or its predecessor in interest, Holden Beach Realty Corporation, had dedicated the roadway to public use. The State of North Carolina, *ex rel.* S. Thomas Rhodes, Secretary of the Department of Natural Resources and Community Development, intervened in 1987 on the ground that it was the designated state agency authorized to manage public beach accessways under N.C.G.S. §§ 113A-134.1 and -134.2. The State did not assert the public trust doctrine as an independent means of acquiring rights to the road. The trial judge concluded at the end of defendant's evidence that the public held no prescrip-

tive easement in the road due to changes in the location of the path and interruptions of use during the prescriptive period. The judge also concluded that there had been no offer or acceptance of dedication of the roadway. The Court of Appeals affirmed in all respects, 95 N.C. App. 38, 381 S.E.2d 810, and we granted the plaintiff-appellants' petition to review the issue of the prescriptive easement. The acceptance and dedication issue is not before this Court for review.

The easement sought by the plaintiffs is over property located at the far western end of what is now Holden Beach. Holden Beach is a sandy barrier island made up largely of sand dunes and beach vegetation, lying on a generally east-west axis off the coast of North Carolina in Brunswick County. To the west of the island is Ocean Isle; to the east, Long Beach. The Atlantic Intracoastal Waterway separates the north shore of Holden Beach from the mainland. Lockwood Folly Inlet connects the Intracoastal Waterway to the Atlantic Ocean on the eastern shore of the island, and Shallotte Inlet offers passage to the ocean on the western shore. The road over which plaintiffs claim a public prescriptive easement is now known as "Ocean View Boulevard West" and is located within the Holden Beach West Subdivision.

Prior to the dredging of the Intracoastal Waterway in the early 1930s, Holden Beach was in fact two islands of roughly equal size. To the east lay Holden Beach, and to the west was Robinson's Beach. Separating the two near where the Holden Beach Fishing Pier now stands was an inlet known variously as Meares or Mary's Inlet. What is now the Intracoastal Waterway was formerly a creek, and a wooden bridge suitable for use by automobiles spanned that creek. It was by this bridge that the public could reach Holden Beach from the mainland. Testimony indicated that until Meares Inlet was filled with the tailings dredged from the Intracoastal Waterway project, Robinson's Beach was not accessible to automobile traffic. At the time of the project to construct the Intracoastal Waterway, the Holden family owned the original island of Holden Beach through a land grant received from Governor Dobbs in 1735. In exchange for land lost to the Intracoastal Waterway, the State granted the Holdens a covenant to provide access to Holden Beach in perpetuity. This access initially took the form of a two-car ferry, which the State eventually replaced with a bridge in 1953.

CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES

[329 N.C. 37 (1991)]

Until the early 1960s, the land on the far western end of what is now Holden Beach was owned jointly by two families, the Robinsons and the Bellamys. There were no houses or paved roads on the island during the 1920s and 1930s. In 1962, the Holden Beach Realty Corporation, predecessor to defendant Holden Beach Enterprises, Inc., purchased the tract of land now known as Holden Beach West Subdivision from the Robinson and Bellamy families. This tract extends approximately one mile east of the Shallotte Inlet and includes the entire western tip of the island. A significant physical feature of this property is a low-lying area approximately 2,000 feet long caused by overwash of the ocean from Hurricane Hazel in 1954 and which has been frequently overwashed since that time. The eastern end of the overwash lies approximately 1,400 feet from the eastern property line. From time to time, storm tides have reflooded the area, obliterating trails and destroying vegetation in the overwash.

Development on what is now Holden Beach began unmistakably in the 1940s when the State began a gradual process of paving an east-west road across the island. The road, which has since come to be known as "Ocean Boulevard," started at the ferry landing near Lockwood Folly Inlet and, by the time Hurricane Hazel struck the island in 1954, reached some distance past the Holden Beach Fishing Pier. By 1962, the paved road extended west approximately two and a half miles past the pier but fell short of the subdivision property line by some 2,880 feet, slightly over one-half mile. There existed at this point an area called "the west turn around," which people used to turn their cars around, to park their cars, and to gain both pedestrian and vehicular access to the beach. Not until 1982 or 1983 did the State pave the 2,880 foot segment of Ocean Boulevard running from the west turnaround to the boundary line of defendant's property. It is the extension from the end of Ocean Boulevard known as "Ocean View Boulevard West" over which the prescriptive easement is claimed.

During the years 1977 and 1978, defendant's predecessor in interest, Holden Beach Realty Corporation, laid a marl road from the boundary line west to within 1,700 or 1,800 feet of Shallotte Inlet, a distance of approximately 3,700 feet, or seven-tenths of a mile. The marl road followed precisely a road bulldozed by the same corporation a few years earlier. Defendant purchased the property and paved the marl road in 1985. The private developers paid all costs for the bulldozing, marling, and paving of the road.

CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES

[329 N.C. 37 (1991)]

It is access along and across this improved road, Ocean View Boulevard West, that is in question.

Prior to the time that the State paved Ocean Boulevard to the entrance of Holden Beach West, an unimproved road extended from the west turnaround, westwardly for approximately three-tenths of a mile to a campground. This unimproved road continued west through the campground to the subdivision boundary line. This state-maintained public road is now known as Ocean Boulevard and is not a subject of this dispute.

The evidence presented was in substantial conflict. The plaintiffs' evidence tended to show that, before the island was developed, fishermen, swimmers, picnickers, and others seeking recreation had used the west end of Holden Beach near the Shallotte Inlet freely, openly, and in an unrestricted manner. The public gained access to the area by vehicle and by foot along a pathway or road running through the island to the inlet. Mr. Harrell Paden further testified that he began going down to the end of the island in the late 1920s or early 1930s practically every weekend during the fishing season and camped there a week or two at a time. When asked to describe the road he used, Mr. Paden testified:

> It was a sand road behind the sand dune. At places it was good and hard, at places it was soft sand, so you got up a good speed before you got there to get across through that sand and got on down the beach where you was going. It was just a two rut road, just a regular old sand road.

Through the years, storms, hurricanes, winds, high water, and erosion have altered the configuration of the island and the course of the pathway. There was evidence to the effect that the newer marled and later paved extension of the public road, that portion known as Ocean View Boulevard West, generally follows the path the public used for more than thirty years prior to the construction of any road. Plaintiffs' evidence was to the effect that the public continued to use the extension of the road known as Ocean View Boulevard West after the western end of the island began to develop. There was also evidence to the effect that the Town of Holden Beach used the extension of the road for both fire and police vehicles, to collect garbage through its contractor, and for a public water line, fire hydrants, and street signs.

CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES

[329 N.C. 37 (1991)]

On the other hand, defendant's witnesses testified to the effect that the west end of the beach had the reputation of being private property, and although public use of the paths to the beach and sound increased over the years, attempts to curtail that use met with varying degrees of success, and most people gained access to the west end of the beach by going along the beach strand.

Loie J. Priddy, a registered land surveyor with the North Carolina Geodetic Survey, testified for the State, as an expert in coastal surveying and in the interpretation of aerial photography, that a 1966 aerial photograph indicated vehicular traffic east of the overwash area but found none through the overwash or west of it. He noted that there was evidence of storm damage to the overwash area that would have obliterated any track crossing that low-lying area. Priddy was able to discern from a 1968 aerial photograph a continuous trail extending from the property line through the overwash to a point some 1,000 feet west of the overwash. A 1969 aerial photograph revealed a track extending west through the overwash and going out the other side before ending as "meandering trails." Two separate aerial photographs taken in 1970 show the trail disappearing into the overwash and reappearing on the western side and finally ending in a series of random loops and trails.

Mr. Priddy examined an aerial photograph taken in 1972 and determined the presence of a trail extending from the subdivision property line through the Hurricane Hazel overwash area and ending in a maze of tracks. A 1976 aerial photograph presented by defendant depicted a trail extending from the property line eastward through the overwash area, ending in a series of looping trails. By reference to current tax maps of Holden Beach West, Priddy testified that the present location of Ocean View Boulevard West followed the same general route as the pathway apparent in the 1968 and later aerial photographs at least as far as the west end of the overwash area.

Comparing eight such aerial photographs of the area taken between 1962 and 1972, Mr. Priddy testified essentially that a definite, discernible pathway made by vehicles and foot traffic had existed since 1962 and followed the same route from Ocean View Boulevard West toward Shallotte Inlet.

When asked to fix the distance between the centerline of the current road and a point randomly chosen along the path, Priddy

determined that the corresponding point in the centerline of the paved road was sixty feet north of the trail as depicted in a 1970 Army Corps of Engineers topographic map. Other witnesses for the plaintiffs and for the defendant indicated that in more than one place the paved road digressed from the sand trails distances of up to two hundred feet. According to James Griffin, testifying for the defendant, the road was marled and paved according to plans made by a Raleigh consulting firm, without reference to existing trails. "[I]n some places [the road] crossed [the trails], some places it overlapped them, but most of the time it ran parallel to it and some distance off." When asked whether the road was along the same track in 1985 as it was when he used it over the roughly forty-year period since 1940, plaintiffs' witness Harrell Paden stated:

> [T]he road has been moved back the width of a building lot. It is still in the same general direction, same general location except for that. . . .
>
>           . . . .
>
> . . . [The trail] wasn't absolutely straight because when you came to a sand dune—you are riding in a two wheel [drive] vehicle you don't go over the sand dune, you go around it. Therefore, the road wasn't absolutely straight as it is today. Today you look down there [and] the road is reasonably straight.

Mr. Paden testified that over the forty plus years prior to 1972, he, his friends, and other people had used the road freely and unimpeded to travel to the west end of Holden Beach. He stated that the road had been over the same general path during that entire time and that when a hurricane swept over it, a trail was reestablished in generally the same location.

Mr. Raymond Cope testified that, since the mid-1970s, he and his family frequently went through the overwash area, down the paths, and over the sand dunes to the western end of the island to gain access to Shallotte Inlet. These trips averaged about twice a month during the summer and also in the fall through about October. The paths always appeared to him to be in approximately the same location. When asked to compare the location of the presently paved road to the paths he had used since the mid-1970s, he testified: "It runs about the same, there is not much difference."

Kermit Coble, a former member of the Holden Beach Town Council, testified that he first came to Holden Beach in 1954, and since that time, he frequently visited Shallotte Inlet using the pathway which continued west after the paved road stopped. Coble testified that Ocean View Boulevard West was within one hundred feet of the pathway he had used to get to Shallotte Inlet.

In order to establish an easement by prescription, the claimant must meet the six criteria set out in *West v. Slick*, 313 N.C. 33, 326 S.E.2d 601 (1985):

"1. The burden of proving the elements essential to the acquisition of a prescriptive easement is on the party claiming the easement.

"2. The law presumes that the use of a way over another's land is permissive or with the owner's consent unless the contrary appears.

"3. The use must be adverse, hostile, or under a claim of right. . . .

"4. The use must be open and notorious. . . .

"5. The adverse use must be continuous and uninterrupted for a period of twenty years. . . .

"6. *There must be substantial identity of the easement claimed.* . . ."

*Id.* at 49-50, 326 S.E.2d at 610-11 (emphasis added) (quoting *Dickinson v. Pake*, 284 N.C. 576, 580-81, 201 S.E.2d 897, 900-01 (1974)).

[1] It is the last of these criteria, the question of the substantial identity of the easement, with which we first concern ourselves. Our review of the record and transcript makes clear that the trial judge made no determination whether there was a substantial identity of the easement claimed. The trial judge made no finding or conclusion as to substantial identity.

It appears from at least three of the trial judge's findings pertinent to the issue in question that he acted under a misapprehension of the law as to the standard by which he was to determine whether the public had acquired an easement by prescription:

53. No *single* path was used east of the overwash area (and within the Subdivision) for the required twenty years.

54. Any paths within the Subdivision existing prior to the road construction in 1978 were temporary in nature; curved around the shifting sand dunes, and were frequently obliterated by the processes of nature.

. . . .

57. Neither the members of plaintiff organization nor the general public have used the *same* definite and specific line of travel across defendant's property for the required twenty years.

(Emphasis added.) From these and other facts found, the trial court concluded that the public's use of the roadway "has not been confined to a *definite and specific line* of travel for twenty years" (emphasis added) and held that the plaintiffs had failed to establish a public easement by prescription.

Rather than applying the "substantial identity" test, the trial judge determined only that the plaintiffs had failed to show the existence of a "single" or the "same" definite and specific line of travel for the prescriptive period. In this, he erred. " 'Facts found under misapprehension of the law will be set aside on the theory that the evidence should be considered in its true legal light.' " *Helms v. Rea*, 282 N.C. 610, 620, 194 S.E.2d 1, 8 (1973) (quoting *McGill v. Lumberton*, 215 N.C. 752, 754, 3 S.E.2d 324, 326 (1939) ), and cases cited therein.

It is true that, although the evidence may have supported findings to the contrary, the findings of fact of the trial judge are conclusive on appeal if supported by any competent evidence. *Williams v. Insurance Co.*, 288 N.C. 338, 342, 218 S.E.2d 368, 371 (1975). Moreover, it is the province of the fact finder to determine whether location of the disputed way deviates substantially over time so as to work an abandonment of that way. *West v. Slick*, 313 N.C. 33, 44-45, 326 S.E.2d 601, 608; *Potter v. Potter*, 251 N.C. 760, 766, 112 S.E.2d 569, 573 (1960). However, the findings of fact as well as the conclusions of law must address the criteria of the proper legal standard to be applied in this case.

[2]   Whether changes in a traveled way are so great as to establish that there is no substantial identity of the way claimed is a question

for the trier of fact. Factors which the fact finder may consider in making this determination include the vulnerability of the road traveled due to forces of nature. This is particularly pertinent where the easement claimed is across windswept, shifting sands which are subject to ocean storms. To require that there be no change, or at most only very slight change, in a road traveled by many for the prescriptive period over an area highly vulnerable to the forces of wind, shifting sand, ocean tide, flooding from ocean or sound, etc., would effectively bar the acquisition of a prescriptive easement in many locales of the coastal area of our state. In the area of our Outer Banks, where in years past there were only paths or roads on and through shifting sands, that the way traveled must be confined to a definite and specific line is merely a requirement that there be a means to determine with reasonable specificity the location of the easement claimed. Requiring "substantial identity" of a definite and specific line gives the owner of the subservient land notice of not only the adverse claim, but the extent of it as well.

In *West*, we reversed the Court of Appeals' affirmance of a directed verdict concluding that plaintiffs' evidence failed to identify specific and definite lines or routes of use in two claimed easements. *West v. Slick*, 60 N.C. App. 345, 348, 299 S.E.2d 657, 660 (1983), *rev'd*, 313 N.C. 33, 326 S.E.2d 601 (1985). As is the case here, the easements claimed in *West* were over unimproved sand trails located behind the sand dune line of an island in the Outer Banks. In that case, there was evidence of deviation in the line of travel in particular spots by as much as three hundred feet. *West v. Slick*, 60 N.C. App. at 348, 299 S.E.2d at 660. Routes varied due to the effects of wind, rain, and tides on the beach. *Id.* An aerial photograph of the routes showed the routes "clearly visible in some areas while impossible to discern in others, but generally . . . pointed out." *Id.* at 349-50, 299 S.E.2d at 660. In places blowing sand obscured the tracks. Given the vulnerability of the sand road to the effects of nature, this Court determined that particular deviations could be viewed as "slight" and that such "deviation was not substantial." *West v. Slick*, 313 N.C. at 45, 326 S.E.2d at 608. As in *West*, the fact that there may have been deviations in the line of travel does not necessarily mean that there was no substantial identity of the easement claimed. Nor does evidence of several trails and points of access to the ocean foreshore, the inlet, or the sound mean that the fact finder

could not find there was substantial identity of the easement claimed. *Id.* at 43, 45, 326 S.E.2d at 607, 608.

Numerous other jurisdictions also take into account the character of the land over which one claims an easement when determining whether the easement has substantially retained its identity. In *State v. Hull*, 168 Neb. 805, 97 N.W.2d 535 (1959), variations from one hundred to two hundred feet to avoid sand blowouts, mudholes, and natural obstacles in a road through the sand hills of Nebraska did not preclude a jury finding that the road retained its substantial identity, given the inherent nature of the area crossed by it. *Id.* at 823, 97 N.W.2d at 547. In *Hull* the point of entrance had been continuous throughout the prescriptive period, the road had traversed the same general area, and any deviation in the road was caused by nature or by the landowner acting for his own convenience. Thus, the Nebraska court concluded that a jury could properly find substantial identity of the road based upon evidence of its origin, general location, course, and use. In *Nonken v. Bexar County*, 221 S.W.2d 370 (Tex. Civ. App. 1949, writ ref'd, n.r.e.), variations of up to thirty-five feet did not prevent a verdict in favor of an easement where the dirt road ran along a river bottom and would ordinarily vary some over the years as a result of rains and washouts. A 1986 Texas case applied this concept of rolling easements in the context of a beachfront public easement. *Feinman v. State*, 717 S.W.2d 106 (Tex. Ct. App. 1986, writ ref'd, n.r.e.). *Feinman* held that shifts occurring from time to time in the beach vegetation line due to storm action did not defeat establishment of a prescriptive public easement defined by the mean low-tide line on the ocean side of the beach strand and by the vegetation line on the landward side. *Id.* at 113; *see also Seaway Co. v. Attorney General*, 375 S.W.2d 923, 939 (Tex. Civ. App. 1964, writ ref'd, n.r.e.).

In the case now before us, evidence that the easement claimed had a dynamic quality due to the landscape over which it traveled would not require a finding that there was no substantial identity of the easement claimed. *See generally Weigel v. Cooper*, 245 Ark. 912, 436 S.W.2d 85 (1969); *Sturm v. Mau*, 209 Neb. 865, 312 N.W.2d 272 (1981); Annotation, *Acquisition of Right of Way by Prescription as Affected by Change of Location or Deviation During Prescriptive Period*, 80 A.L.R.2d 1095 (1961); Annotation, *Acquisition of Right of Way by Prescription as Affected by Change of Location or Deviation During Prescriptive Period*, 143 A.L.R. 1402 (1943).

CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES

[329 N.C. 37 (1991)]

The fact that the portion of the easement claimed, which was marled and then paved by defendant, varies slightly from the old pathway does not, in and of itself, defeat the claim of a prescriptive easement over that portion of the pathway. Changes made to suit the convenience of the owner of the subservient land during the prescriptive period do not destroy the identity of the road claimed. *See, e.g., Faulkner v. Hook,* 300 Mo. 135, 254 S.W. 48 (1923) (schoolchildren acquired prescriptive easement even though changes in path made by landowners during the prescriptive period); *Moravek v. Ocsody,* 456 S.W.2d 619 (Mo. Ct. App. 1970) (straightening and eventual paving of dirt wagon trail during prescriptive period did not defeat claim in present paved road); *Scott v. Weinheimer,* 140 Mont. 554, 374 P.2d 91 (1962) (location of road changed by roughly two hundred feet, after which time claimant followed new course without protest); *State v. Hull,* 168 Neb. 805, 97 N.W.2d 535 (eighty-five-foot change in location).

We must remand the case for a new trial because the trial court applied an incorrect standard in determining whether a path through the shifting dunes had been used by the public for the requisite period of time.

[3] Because the question will likely recur at the new trial, we now determine whether the trial court correctly concluded that defendant interrupted the use of the pathway in question by the general public in a manner that caused that use not to be continuous and uninterrupted.

Another of the six requirements in establishing a claim for a prescriptive easement is that the use be continuous and uninterrupted. *West v. Slick,* 313 N.C. at 50, 326 S.E.2d at 611. The trial judge found as a fact and concluded as a matter of law that defendant had interrupted the use of the easement claimed since at least 1962. We disagree. The evidence showed that defendant gradually escalated efforts to prevent unauthorized passage through the property. The evidence further shows, however, that as defendant's efforts escalated, so did the acts of the public to assert its claim to the use of the roadway by disregarding the barricades and, in fact, removing and in some cases destroying them. In 1960, defendant erected some forty or fifty "No Trespassing" signs. People who continued to use the pathway used the signposts for firewood. Sometime in the late 1960s or early 1970s, defendant placed a piece of telephone pole across the road. Members of the

public avoided the barrier by driving around either end of the pole, passing so often that their passage dug deep ditches. Witness Harrell Paden, who testified that he used the road in question from 1928 until 1985, also testified that no barriers had been placed on the road up through the 1960s; that the first barrier was an eight- to ten-foot piece of telephone pole placed across the road in 1972; that people drove around it, and it disappeared after several weeks; that two or three years later a gate and signs were put up, but they did not stop him, his friends, or other people from using the road; and that the number of people using the same road to reach the west end of the beach over the fifty-year period increased as the years went by.

Prior to the erection of a gate, defendant cut a pole in half, placed the halves on either side of the road as posts, and strung a twelve-foot padlocked cable between them. This cable eventually reached a length of two hundred feet in an ineffectual effort to stop the public from driving around either end of the cable. Later, in the late 1970s, defendant erected and locked two ten-foot-wide aluminum farm gates across the way. Witness Kermit Coble testified that when the farm gate and a cable with locks were put across the road, he observed "plenty of" traffic going around them such that "[t]hey dug out ditches around there getting around." In addition to the considerable testimony from several other witnesses that people drove around the farm gate, defendant's witness James Griffin testified to the effect that people actually destroyed the gates. When asked how many gates he replaced, he said:

A. Went through about four or five right there.

Q. How long did they stay up, sir?

A. Different lengths of time, each until somebody got angry enough to push it down with a four-wheel drive or pull it lose [sic] or whatever. And then I'd go get another one, as a matter of fact, we started keeping one in stock more or less, to go down there and put back as they would be torn up.

Witness Raymond Cope testified that he started going down to Holden Beach in the mid-1970s and used the road in question until 1985; that over that period of time, the road stayed in the same location; that, in relationship to the present paved road, "there is not much difference"; and that in 1985, when he went to the beach, the road was barricaded and the guard tried to stop him:

CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES

[329 N.C. 37 (1991)]

He would say that we couldn't go any further that this was private property and wanting us to turn around. We did, but what we would do, we would ignore him a couple of times, we wouldn't even stop, we would just keep right on going. I mean he would just stand there wanting us to stop, but we just kept going on through. And he would get our licenses [sic] number, you could tell he was writing our licenses [sic] number down. So, we went all the way down to the end, all the way down to the very end of the island, we would park down at the island and go out on the beach. We'd fish, shell hunt, just walk around, and when we came back out the same guard was there doing the same—looking at us giving us a real hard stare.

Mr. Cope further testified that the gate never stopped him or his family when they chose to go to the west end of the beach. On one occasion, he went down to the inlet on the road with ten to fifteen other cars after being threatened with arrest for trespassing.

The property owner's frustration at the failure of his efforts to stop the public's use of the roadway was apparent in the testimony given by an agent. "[W]hat does it take to keep somebody out of a place," defendant's agent, Mr. Griffin, asked. "[H]ave you got to set a tank up, a machine gun, or what[?]"

This evidence goes far beyond what this Court has required to establish the use as being "hostile," thus repelling any inference that it is permissive, or that the use be "open," thus giving notice to the owner that the use is adverse.

"To establish that a use is 'hostile' rather than permissive, 'it is not necessary to show that there was a heated controversy, or a manifestation of ill will, or that the claimant was in any sense an enemy of the owner of the servient estate.' [Citations omitted.] *A 'hostile' use is simply a use of such nature and exercised under such circumstances as to manifest and give notice that the use is being made under a claim of right.*" Dulin v. Faires, [266 N.C. 257, 260-61, 145 S.E. 2d 873, 875 (1966)]. There must be some evidence accompanying the user which tends to show that the use is hostile in character and *tends to repel the inference that it is permissive and with the owner's consent. . . .*

. . . The use must be open and notorious. "The term adverse user or possession implies a user or possession that is not only under a claim of right, but that it is *open and of such character that the true owner may have notice of the claim*; and this may be proven by circumstances as well as by direct evidence." *Snowden v. Bell*, 159 N.C. 497, 75 S.E. 721 (1912).

*Dickinson v. Pake*, 284 N.C. 576, 580-81, 201 S.E.2d 897, 900 (emphasis added).

The fact that the barricades placed by the defendant may have discouraged the use of the pathway by a few members of the public or even suspended its use very briefly by the entire public does not destroy the public's continuity of use for the period necessary to establish its right by prescriptive use. To effectively defeat a prescriptive right, an interruption of the use must be accompanied by some act of the owner which *prevents* the use of the easement. 2 *Thompson on Real Property* § 347, at 257 (1980). A "substantial" interruption during the period of use will defeat the plaintiffs' claim to the prescriptive easement. 28 C.J.S. *Easements* § 13, at 649 (1941).

While continuity of use by the public is essential, it need not be perpetual and unceasing.

The "continuous" usage required of a claimant of an easement by prescription does not mean a perpetually unceasing use, but has been construed reasonably to depend on the nature of the easement asserted. *The continuity required is that the use be exercised more or less frequently, according to the purpose and nature of the easement.* It is necessary, however, that the use be often enough and with such regularity as to constitute notice to the potential servient owner that the user is asserting an easement.

P. Hetrick & J. McLaughlin, *Webster's Real Estate Law in North Carolina* § 321, at 390 (3d ed. 1988) (footnotes omitted) (emphasis added).

In the early case of *Williams v. Buchanan*, 23 N.C. (1 Ired.) 535 (1841), this Court held that the placing of fish traps in a river every year only during the fishing season for the purpose of catching fish constituted sufficiently "continuous" possession to pass title by adverse possession. In *Perry v. Williams*, 84 N.C. App.

CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES

[329 N.C. 37 (1991)]

527, 353 S.E.2d 226 (1987), our Court of Appeals held that use of a roadway during each growing season for at least forty years was sufficient, continuous, and uninterrupted use for purposes of establishing a prescriptive easement.

While it has been said that an interruption of the use "however briefly" destroys continuity of use[1] and this Court has noted that an interruption would be any act which would prevent the *full and free* enjoyment of the easement,[2] those statements must be understood in the context of the situation to which they have related. Most often, if not always, they have been made with regard to claims by individuals to a right-of-way or easement over the lands (generally farmlands or woodlands) of neighbors, in most cases to gain access to a public road. "What period of interruption . . . will defeat the acquisition of the right by prescription depends upon the nature of the right and the attendant circumstances." 2 *Thompson on Real Property* § 347, at 249-50 (1980). In a situation such as is under consideration here, where the claim is by the public over the shifting sands of a barrier island seldom visited by anyone on a daily basis and particularly during times of bad weather, the use need only be more or less frequent according to the purpose and nature of the easement, that is, often enough and with such regularity as to give the owner notice that the users are asserting a claim of right to use the route. Evidence of such use by the public could hardly be clearer than in the present case.

The "purpose and nature" of the easement here was to reach the inlet and seashore for fishing, bathing, and other recreational use. In this case, the public's use was " 'exercised more or less frequently, according to the purpose and nature of the easement.' " *Dickinson v. Pake*, 284 N.C. at 581, 201 S.E.2d at 901 (quoting J. Webster, *Real Estate in North Carolina* § 288 (1971) ); *accord Godfrey v. Van Harris Realty, Inc.*, 72 N.C. App. 466, 325 S.E.2d 27 (1985) (requirement for easement by prescription that adverse use be continuous means that it must be exercised more or less frequently, according to the purpose and nature of the easement).

1. *See* P. Hetrick & J. McLaughlin, *Webster's Real Estate Law in North Carolina* § 321 (3d ed. 1988).

2. *See Dickinson v. Pake*, 284 N.C. 576, 581, 201 S.E.2d 897, 901 (quoting *Ingraham v. Hough*, 46 N.C. (1 Jones) 39 (1853) ).

Defendant contends that placing of the various barricades across the roadway for brief periods was sufficient to interrupt plaintiffs' use of the road. Ineffective interruptions will not prevent the use from ripening into an easement.

> An interruption to the enjoyment of a right before an easement by prescription has been acquired defeats the acquisition of it, *but the mere doing of acts on the land which renders the exercise of the claim less convenient does not necessarily have that effect.* It is as competent for one to acquire a prescriptive easement of a passway burdened with gates as to acquire one unburdened.

2 *Thompson on Real Property* § 347, at 249 (1980); *see Guerra v. Packard*, 236 Cal. App. 2d 272, 46 Cal. Rptr. 25 (1965) (a locked gate did not constitute an interference or interruption to plaintiffs' use of the roadway). Defendant's repeated protests, remonstrances, blockages, and other attempts to interfere with the use of the path, all of which failed, are the strongest kind of evidence of adverse use and have no significance as interruptions of the public's use.

> Ineffective protests or disregarded remonstrances only strengthen the evidence of adverse use . . . and have no significance as interruptions of the claimant's use.

3 *Powell on Real Property* ¶ 413, at 34-126 to -127 (1990); *see also Trustees of Forestgreen Est., 4th Addition v. Minton*, 510 S.W.2d 800, 803 (Mo. Ct. App. 1974) ("The unsuccessful efforts to block the roadway do not enervate plaintiffs' position that their use was uninterrupted, for, in fact, the barriers did not obstruct the use. Plaintiffs' actions in immediate removal of the barriers to avoid hampering of their use strengthens their argument of adverse, hostile use under claim of right.").

The evidence does not support the finding of fact and conclusion of law that defendant successfully interrupted adverse use by the public. Having concluded that the trial judge employed an erroneous standard in his determination that there was no definite and specific path and that his finding and conclusion with regard to interruption of the continuous use is not supported by the evidence, we conclude that plaintiffs were prejudiced by these errors.

When the order or judgment appealed from was entered under a misapprehension of the applicable law, the judgment, including

**CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES**

[329 N.C. 37 (1991)]

the findings of fact and conclusions of law on which the judgment was based, will be vacated and the case remanded for further proceedings. *Davis v. Davis*, 269 N.C. 120, 127, 152 S.E.2d 306, 312 (1967). We therefore vacate the judgment of Briggs, J., entered 12 November 1987 and the findings and conclusions contained therein and reverse the opinion of the Court of Appeals which affirmed that judgment. The case is remanded to the Court of Appeals with instructions to further remand to Superior Court, Brunswick County, for further proceedings not inconsistent with this opinion.

We note dicta in the Court of Appeals opinion to the effect that the public trust doctrine will not secure public access to a public beach across the land of a private property owner. *Concerned Citizens v. Holden Beach Enterprises*, 95 N.C. App. at 46, 381 S.E.2d at 815. As the statement was not necessary to the Court of Appeals opinion, nor is it clear that in its unqualified form the statement reflects the law of this state, we expressly disavow this comment.

Reversed and remanded.

Justice MITCHELL dissenting.

I believe that the majority errs in holding that the evidence failed to support the trial court's findings and conclusions to the effect that the defendant interrupted the plaintiffs' use of the road now known as Ocean View Boulevard West and, thereby, prevented the creation of an easement by prescription over that road. In my view, the evidence, even as summarized in the opinion of the majority, supported the trial court's findings and conclusions that the plaintiffs' use of the road was interrupted by the defendant and its predecessor in title on numerous occasions. Therefore, I am of the opinion that the trial court did not err in concluding that the plaintiffs held no prescriptive easement in the road, and that the Court of Appeals was correct in affirming the judgment of the trial court.

I note at the outset my agreement with the majority's view that by virtue of the limited nature of our order allowing discretionary review in this case, the questions of whether the defendant dedicated the road in question here to public use and whether any such dedication was accepted by the proper public authorities are not before us. Instead, we are faced only with issues to be

resolved in determining whether the plaintiffs have established a prescriptive easement. Even so, as these plaintiffs attempt to establish the right of the entire public to a prescriptive easement across the defendant's land, an argument can be made that, as a matter of law, the easement does not exist unless control of it has been accepted by properly constituted public authorities. *See, e.g., Chesson v. Jordan,* 224 N.C. 289, 29 S.E.2d 906 (1944). I find it unnecessary to consider or attempt to resolve any such question, however, as I believe that the trial court was correct in concluding that the plaintiffs' *adverse* use of the easement asserted was interrupted several times and did not continue without interruption for the required period of 20 years.

In the present case, the plaintiffs' evidence tended to show that the previous owners of the land on which Ocean View Boulevard West is now located permitted members of the public to cross their land at will until the 1960's. For example, the plaintiffs' witness Harrell Paden, a long-time Brunswick County resident, testified that he and his family crossed the land in question regularly from the 1930's through the 1950's, and were *allowed to do so by the owners*. Although the defendant offered evidence that its property had always had the reputation of being private property, the evidence tending to show that the former owners of the property *permitted* the public to cross it at will prior to 1960 was uncontroverted. Additionally, easements by prescription are not favored in the law. *Potts v. Burnett,* 301 N.C. 663, 273 S.E.2d 264 (1981). Thus, "[t]he law presumes that the use of a way over another's land is permissive or with the owner's consent unless the contrary appears." *Dickinson v. Pake,* 284 N.C. 576, 580, 201 S.E.2d 897, 900 (1973). In light of the defendant's evidence, with no evidence to the contrary having been introduced, the trial court was required to find and conclude that any crossing of the defendant's property by the plaintiffs prior to 1960 was a mere *permissive* use which could not commence the 20-year period of adverse use required for the establishment of an easement by prescription. *Id.*

Based upon substantial competent evidence introduced at trial in the present case, the trial court found that Holden Beach Realty Corporation, the defendant's immediate predecessor in title, purchased the land now owned by the defendant in 1962. The trial court further found, *inter alia*:

7. Defendant, Holden Beach Enterprises, Inc., was incorporated in 1985 and in that same year acquired all the stock of Holden Beach Realty Corporation, [which] . . . was then dissolved and Holden Beach Enterprises, Inc., became the owner of all of its assets through said dissolution.

. . . .

35. In 1963 James Griffin, at the direction of Holden Beach Realty Corporation, personally placed a large log approximately 10 feet in length and one foot in diameter across the entrance to [what is now Ocean View Boulevard West] . . . to restrict unauthorized persons from entering the Subdivision; the log remained in place for *several months time.*

36. In the mid 1960's James Griffin at the direction of Holden Beach Realty Corporation placed a cable across the entrance of [what is now Ocean View Boulevard West] . . . secured by two posts and a lock; subsequently the cable was extended to the north and south along the eastern property line of the Subdivision; *the cable remained in place until 1972.*

37. In 1972 the cable was replaced by Holden Beach Realty Corporation with a farm gate that was secured by lock and key; the farm gate was replaced around 1975 with a second farm gate which *remained intact until around 1979;* the second farm gate was also secured by a lock and key.

38. Keys to the farm gates were issued to persons *allowed* on the Subdivision property by Holden Beach Realty Corporation; the keys were kept at the corporation sales office.

. . . .

40. In 1985 Holden Beach Enterprises, Inc., placed a guard booth at the entrance of the Subdivision in the middle of Ocean View Boulevard further restricting public access to the Subdivision; the guard booth has been manned by security guards employed by Holden Beach Enterprises, Inc., since 1985.

. . . .

55. Defendant and Holden Beach Realty Corporation *interrupted* the general public's use of the Subdivision property on numerous occasions since 1963 by erecting physical barriers across the

entrance to the property; *said barriers remaining in place for substantial periods of time.*

56. The *physical barriers* placed at the entrance of the [what is now Ocean View Boulevard West] . . . by the Defendant and its predecessor in title *prevented* the *full and free* access of the public across the Subdivision property.

(Emphasis added.)

Based upon its findings of fact, the trial court concluded as a matter of law, *inter alia*:

5. Plaintiff's [sic] use and public use of Defendant's property has not been continuous for twenty years and Defendant has interrupted such use since 1963.

. . . .

7. Plaintiff has failed to establish a right held by the general public to a prescriptive easement across Ocean View Boulevard [West] within the Subdivision.

8. Ocean View Boulevard [West] within the Subdivision is a private street.

Based on its findings and conclusions, the trial court adjudged and decreed that: "2. Ocean View Boulevard [West] within Holden Beach West Subdivision is declared to be a private right-of-way over which the public has acquired no prescriptive easement, nor any other rights."

As Professor Webster has noted:

The requirement that an adverse user's usage of land must be "uninterrupted" for the prescriptive period in order to create an easement by prescription means that the evidence must show that the potential servient owner has not succeeded, either by threats or the construction of physical barriers, in causing a *discontinuance* of the use of the land. If the owner of the land blocks the usage of the land, *however briefly*, this destroys the continuity of usage required. While the erection of actual physical barriers preventing usage and the prosecution of a law suit to judgment will constitute "interruptions," mere ineffective protests or disregarded remonstrances should serve only to strengthen the evidence of adverse use

and should have no significance as interruptions of the easement claimant's use.

P. Hetrick and J. McLaughlin, *Webster's Real Estate Law in North Carolina* § 321 (3d ed. 1988) (footnotes omitted) (emphasis added). Stated more succinctly, "[a]n interruption to an easement for a right-of-way 'would be any act, done by the owner of the servient tenement which would prevent the *full and free* enjoyment of the easement. . . .' " *Dickinson v. Pake*, 284 N.C. at 581, 201 S.E.2d at 901 (emphasis added) (quoting *Ingraham v. Hough*, 46 N.C. 39, 44 (1853)).

The majority seems to conclude that the efforts of the defendant, Holden Beach Enterprises, Inc., and its immediate predecessor in title, Holden Beach Realty Corporation, amounted to nothing more than "ineffective protests" or "disregarded remonstrances" which were ignored by the plaintiffs. However, the evidence introduced at trial clearly supported the trial court's findings and conclusions to the effect that the physical barriers erected by the defendant prevented the full and free enjoyment of the easement by the plaintiffs by blocking access to it, however briefly.

The mere uncontroverted fact that the defendant placed cables and gates across the easement — acts which would block or "discontinue" public use sufficiently to be criminal if done in a public highway — permitted the trial court to properly find and conclude that the defendant had prevented the full and free enjoyment of the easement by the plaintiffs. *Ingraham v. Hough*, 46 N.C. 39, 44 (1853). In the present case, however, the defendant was not required to rely solely upon the placing of such barriers to show that it had interrupted the plaintiffs' prescriptive use of the easement. The facts as found by the trial court, which were supported by evidence, indicate that each of the barriers erected by the defendant or its immediate predecessor in title remained in place for several months or several years. The trial court could properly infer from such evidence that the barriers prevented the plaintiffs from using the easement, at least to the extent necessary to temporarily prevent the plaintiffs' full and free enjoyment of the easement; no more was required to support the trial court's conclusion that the defendant had interrupted the plaintiffs' use of the easement sufficiently to discontinue the 20-year measuring period required for establishing a prescriptive easement.

CONCERNED CITIZENS v. HOLDEN BEACH ENTERPRISES

[329 N.C. 37 (1991)]

In fact, the plaintiffs' own witness, Harrell Paden, testified that, when he first came to the gate installed by the defendant in 1974 or 1975, he "turned around and went back." The plaintiffs' witness, Kermit Coble, testified that during the time the cable was across the easement, he only used the easement after friends got the key to the padlock from the owner—a permissive use. Further, there was direct testimony by Sidney Swartz that, as far back as 1964, the public could not get into the Holden Beach West area. Such evidence was more than sufficient to support the trial court's findings and conclusions.

It is true that one witness for the plaintiffs, Raymond Cope, who never went to the area in question before 1973 or 1974, testified that he and his family ignored the barriers which had been erected across the easement and also ignored the guard in the guard booth which was installed later. He also testified that on one occasion, he and others organized a protest and drove past the guard house despite the guard's efforts to stop them. Additional evidence for the plaintiffs tended to show that at times the gates erected across the easement had been knocked down and that there were tire paths around the various obstacles placed across the easement, which evidence would support an inference that some individuals were able to go onto the defendant's property. Such evidence, however, did not in any way preclude the trial court from making findings and conclusions to the effect that the defendant had interrupted and at least temporarily discontinued the plaintiffs' full and free use of the easement. The mere fact that some of the plaintiffs may have been able at times to break down or circumvent the physical barriers erected to prevent unauthorized persons from coming on the defendant's property—which is all the plaintiffs' evidence tended to show—did not prevent the trial court from properly making findings and conclusions to the effect that the defendant and its predecessor in interest had, on numerous occasions for varying periods of time, prevented the full and free enjoyment of the easement by the plaintiffs. Having made just such findings and conclusions, the trial court was required to adjudge, as it did, that "the public has acquired no prescriptive easement, nor any other rights."

For the foregoing reasons, I believe that the trial court did not err in concluding that the plaintiffs' use of the road in question was not continuous and uninterrupted and that the public held no prescriptive easement in the road. Therefore, I dissent and

vote to affirm the decision of the Court of Appeals, which affirmed the judgment of the trial court.

Justices WEBB and WHICHARD join in this dissenting opinion.