Argued June 10, affirmed September 9, 1959
DRESSLER ET AL *v.* ISAACS ET AL
343 P. 2d 714

*G. W. Kellington,* Medford, argued the cause for appellants. On the brief were Roberts, Kellington & Branchfield, Medford.

*Sam B. Harbison,* Medford, argued the cause for respondents. With him on the brief was A. E. Piazza, Medford.

Before ROSSMAN, Justice Presiding, and LUSK, O'CONNELL and CRAWFORD, Justices.

O'CONNELL, J.

The plaintiffs bring this suit in equity to establish their right to the water of certain springs on the defendants' lands and to enjoin the defendants from interfering with the plaintiffs' use of the water and with their efforts to re-establish and maintain a pipeline conveying the water from the defendants' to the plaintiffs' lands.

The plaintiffs allege that they are owners of an easement to take and conduct the waters from the springs on the defendants' lands; that sometime in the latter part of 1951 the defendants wrongfully tore up a portion of the water pipe and prevented the water from flowing to the plaintiffs' dwelling house.

In addition to the request for a decree quieting their easement interest in the defendants' land, the plaintiffs pray for $7,000 damages to the water pipe and easement and $5,000 damages caused to the plaintiffs by reason of having been deprived of the water from the springs. The court denied the relief prayed for and dismissed the complaint.

The plaintiffs rest their claim upon alternative grounds. It is claimed that an appurtenant easement was created in the defendants' land either as a result of an express grant to the plaintiffs' predecessor in interest or by an implied grant which arose upon the separation of plaintiffs' and defendants' lands into

separate tracts by a common grantor. A sketch of the lands involved in the present suit is set out below.

The lands which comprise the alleged dominant and servient parcel originally were owned by J. W. Bybee and were known as the Bybee Ranch. In 1910 Bybee conveyed a parcel of approximately 50 acres in the center of the tract to E. S. Guthrie. This is indicated on the sketch as the Guthrie tract. The deed to Guthrie expressly reserved to Bybee the developed springs on the Guthrie tract, together with an easement to pipe the water from the springs to the land retained by Bybee. The clause in the deed reserving this interest read as follows:

> "Excepting and reserving, however, from the operation of this deed all rights to all developed springs on said property and the right to go through and across the same for all pipe lines now thereon or that may be necessary for the proper use thereof and also the right to go upon the right of way for said pipe line and renew and repair the same at any and all times, it being understood that all pipe

line hereafter constructed thereon shall be placed under ground at least 18 inches."

■ Bybee took back a purchase money mortgage from Guthrie which was foreclosed in 1933 and Bybee purchased the tract at the foreclosure sale. The union of the dominant and servient estates in Bybee would, of course, destroy the easement. 3 Tiffany, Real Property (3rd ed), § 822, p 377. However, it is referred to here because of its possible significance in a later conveyance where reference is made to a water right.

It may be noted in passing that the springs involved in the present suit are not located on the so-called Guthrie tract but lie to the west and to the north of that tract, although there is a springhouse on that tract into which the waters from the north and west springs are piped for further distribution.

The next conveyances of importance are those by which the Bybee Ranch was divided into two parcels which we shall refer to as the north tract and the south tract. It was as a result of these conveyances that the plaintiffs contend their easement was created. The circumstances under which these conveyances were made are as follows. Bybee had died and his heirs wished to dispose of the property. At the time, the Bybee Ranch was under the control of the Farm Security Administration and the negotiations for the sale of the ranch were conducted by Mr. Eugene Hampton, supervisor of that agency. In the preliminary negotiations Charles Ryan secured an option to purchase the entire ranch. Ryan then made arrangements with Roby L. Isaacs and Anna E. Isaacs, his wife, defendants in this case, whereby Ryan would purchase the southerly part of the Bybee Ranch and Isaacs would purchase the northerly part of it. Simultaneous conveyances of the respective tracts were made

on September 4, 1941. These were identical except that the Isaacs deed described all of the land lying north of a described line and the Ryan deed described the land lying south of that line. (See sketch). Each of the deeds contained the following clause:

"Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining and all improvements, water and water rights appurtenant thereto or reasonably necessary to the use of the real property, and the rents, issues and profits thereof."

Both of these deeds were prepared under the supervision of Mr. Hampton, the Farm Security Administration supervisor. For approximately one year after the deeds were executed Ryan and Isaacs operated the entire Bybee Ranch as a unit under an oral partnership agreement. Thereafter, Ryan and Isaacs conducted their farming operations separately. In 1945 Ryan sold the south tract to Everett Hotchkiss. In 1947 Arthur, Bessie and Irene Dressler purchased the south tract from Hotchkiss under a land sale contract. A deed pursuant to the contract was executed to the purchasers in November, 1950. Later, Jesse and Gertrude Dressler, plaintiffs in this case, succeeded to the interest of Irene Dressler. Isaacs retained all of the north tract until August, 1952 when he conveyed the parcel described as the Guthrie tract and property lying west and north of the Guthrie tract to Nate Smith and his wife. This embraced all of the parcel referred to as the Guthrie tract and it also included the land upon which the west springs existed. The north springs were on the land retained by Isaacs.

The interference with the water lines which prevented the water from coming to the plaintiffs' land occurred some time between October and December,

1951, at which time the defendants Isaacs were still in possession of the entire northern portion of the Bybee Ranch which had been conveyed to them under their deed of September 4, 1941.

■ We shall first consider the plaintiffs' contention that the deed from the Bybee heirs to Ryan, conveying the south tract, created in the grantee an easement by express grant. This deed, it will be recalled, conveyed all "appurtenances" and "water and water rights appurtenant thereto or reasonably necessary to the use of the real property." The identical language is contained in the deed to the north tract. This fact and the ambiguity which arises out of the general nature of the language used in the clause makes it difficult to identify the referent intended by that language.

As observed by the trial judge "this is the general type of language contained in many deeds used generally for the purpose of carrying with the grant of land those appurtenances which have been created in the past and is almost never used with the purpose of creating any *new* appurtenance or servitude."

■ The use of the word "appurtenances" is not sufficient to create an easement under these circumstances. As stated in 3 Tiffany, Real Property (3rd ed), § 789, p 276, 278:

> "The decisions are ordinarily to the effect that the fact that a conveyance of the quasi dominant tenement is expressed to be 'with the appurtenances' or with certain rights 'appertaining and belonging' or that similar general terms are used, does not in itself operate to create an easement in the grantee equivalent to the pre-existing quasi easement."

The argument advanced by the plaintiffs, that the language is sufficient to create an easement which

passes as an appurtenance of the south tract is subject to the criticism noted in 3 Powell on Real Property, § 411, p 427, note 3, that it "overlooks the conceptual difficulty of passing as an appurtenance a right in other land which had no existence as a right prior to the conveyance in question," criticizing *Heffley v. Lohr*, 149 Pa Super 586, 27 A2d 275 (1942); *Paci v. Shipley*, 166 Pa Super 374, 71 A2d 844 (1950).

If the clause had been contained solely in the deed to the south tract it would have been possible to treat the deed as conveying "water * * * reasonably necessary to the use of" the south tract and to thus impose a servitude on the north tract. But since the identical language is used in the deed to the north tract a parity of reasoning would require us to find in that language the creation of a water right in the north tract, or if not the creation of such a right then at least the conveyance of one previously created and in existence at the time the deed was executed. There was no evidence of an intent to create a water right in the grantees of the north tract and there was no substantial evidence that the clause in the deed had reference to an existing water right which the grantors intended to convey to the grantees. Had there been evidence of an existing water right to which the language could refer the deeds would then be construed as creating a new easement which would burden one tract at the expense of the other.

The plaintiffs contend that the paragraphs were inserted in each of the deeds for the purpose of making a division of the water right between the grantees. Were this the case it would be expected that the grantors would employ specific language identifying the respective rights of the parties rather than use a paragraph which has a striking similarity with clauses

found in standard form books and commonly used to refer to and convey existing water rights.

If the clause is not regarded as creating a new easement or as conveying one previously created we are faced with the question of the grantor's purpose in inserting the clause in the two deeds. The deeds were prepared by or at the direction of an attorney for the federal government and it is more than likely that he was concerned only, or principally, with the government's interest in the transaction and not with the specific interests which the grantees would acquire. It is not unlikely that the clause found its way into the deeds simply because the draftsman saw in a title report or abstract a reference to the water right reserved in prior deeds. There were such deeds in the plaintiffs' chain of title. The deed from Bybee to Guthrie specifically reserved to Bybee certain rights with respect to the use of the springs. And the patents contained references to water rights reserved to the United States Government. It is possible that he labored under the same mistake as Hotchkiss, who testified that he understood that the reference in the deeds to water rights related to a right to the waters of Walker Creek.

It is not necessary for us to indulge in further conjecture concerning the purpose of the clause in question. The plaintiffs are asserting the existence of an easement; they have the burden of establishing it. *Gange v. Hayes,* 193 Or 51, 237 P2d 196 (1951). They do not meet this burden by furnishing us with a record which reveals possibilities as consistent with the nonexistence of an easement as with its existence. The provisions of instrument relied upon as creating a servitude are strictly construed, "any doubt being resolved in favor of the free use of the land." *Wing v. Forest Lawn Cemetery Ass'n.,* 15 Cal2d 472, 101 P2d

1099, 130 ALR 120 (1940). "* * * the courts will not attempt to discover and give effect to the conjectural intent of the parties to create an easement." 1 Thompson on Real Property (Perm ed), § 359, p 580. *Owsley v. Hamner,* (Cal App 1950) 219 P2d 888; *Halpern v. Silver,* 65 NYS2d 336, 187 Misc 1023, and cases cited.

Turning now to the plaintiffs' second contention that there was an implied easement corresponding to a pre-existing quasi easement, we may note at the outset the following accepted principles of construction. It is generally agreed that implied easements are not favored by the courts. *Orr v. Kirk,* 100 Call App2d 678, 224 P2d 71 (1950); *Marshall v. Callahan,* 241 Mo App 336, 229 SW2d 730 (1950); *Trattar v. Rausch,* 154 Ohio 286, 95 NE2d 685 (1950); 2 American Law of Property, § 8.36, p 258. Various reasons have been given for this rule of strict construction. *Missouri State Oil Co. v. Fuse,* 360 Mo 1022, 232 SW2d 501 (1950), (fetter estates, retard building and improvements); *A. J. and J. O. Pilar, Inc. v. Lister Corporation,* 38 NJS 488, 119 A2d 472, 121 A2d 741 (1956), affirmed 123 A2d 536, (violate policy of recording acts); *Miller v. Hoeschler,* 126 Wis 263, 105 NW 790, 8 LRA (NS) 327 (1905), (retard building). It would seem enough to say that a man's land should not be burdened with an easement unless the intent to create it is clearly manifested or the circumstances are such as to clearly show that had the grantor considered the matter he would have intended an easement to burden his land. *Jack v. Hunt,* 200 Or 263, 264 P2d 461 (1953), rehearing denied 265 P2d 251; *Rose v. Denn,* 188 Or 1, 212 P2d 1077 (1949), rehearing denied 213 P2d 810; *German Savings & Loan Society v. Gordon,* 54 Or 147, 102 P 736, 26 LRA (NS) 331 (1909); *Fristoe v. Dra-*

*peau,* 35 Cal2d 5, 215 P2d 729 (1950) ; *Peet v. Schurter,* 142 Cal App2d 237, 298 P2d 142 (1956) ; 3 Tiffany, Real Property (3rd ed), § 781, p 255, 256. Irrespective of the character of the proof which the person asserting an implied easement must adduce, it is universally agreed that he has the burden of proof. *State v. Deal,* 191 Or 661, 233 P2d 242 (1951) ; *Krinsky v. Hoffman,* 326 Mass 683, 95 NE2d 172 (1951) ; *Olson v. Mullen,* 244 Minn 31, 68 NW2d 640 (1955) ; *Schnider v. M.E.H. Realty Investment Co.,* 239 Mo App 546, 193 SW2d 69 (1946) ; *Miller v. Edmore Homes Corp.,* 137 NYS2d 324, 285 App Div 837 (1955), affirmed 309 NY 839, 130 NE2d 623; *Frater Oklahoma Realty Corp. v. Allen Laughon Hardware Co.,* 206 Okla 666, 245 P2d 1144 (1952).

To carry the burden of proof the plaintiffs must establish that at the time of the division of the Bybee Ranch into the parcels which we have referred to as the north and south tracts, the grantor intended to burden the north tract with a servitude for the benefit of the south tract. At the time of the severance of the land the circumstances must be such as to permit an inference that had the grantor put his mind to the matter he would have intended the servitude to be created. It is not necessary for us to review the factors which are important in drawing the permissible inference. They are set forth in *Jack v. Hunt,* supra at p. 267 and *Rose v. Denn,* supra, and 4 Restatement, Property, Servitudes, § 476.

■ To create an easement by implication from the previous use of quasi dominant and quasi servient parts of a grantor's land it is generally held that the previous use must have been apparent, permanent and "important for the enjoyment of the conveyed quasi-

dominant parcel." 3 Powell, Real Property, § 411, p 424, 428. We do not regard these as the only factors of importance in arriving at the intention of the parties; they are, like the other factors listed by the Restatement, merely aids in drawing inferences of that intention. See Note, 57 Mich L Rev 724 (1959). At the time of severance the use of the spring waters on the south tract was apparent and the use was of a type which is generally recognized as permanent in character. Therefore, the factors of apparency and permanence are present to support the inference. The factor of "importance" remains to be considered.

It is evident from the adjudicated cases that some courts are more strict than others in their interpretation of the requirement of "importance." That requirement may be stated in terms as rigorous as "reasonable necessity", *Dean v. Colt,* 151 Or 331, 49 P2d 362 (1935) ; *Evich v. Kovacevich,* 33 .Wash2d 151, 204 P2d 839 (1949) ; or as lenient as "convenient or comfortable enjoyment", *Barrick v. Gillette,* 187 SW2d 683 (Tex Civ App, 1945) ; or it may be expressed in a number of other ways. See cases collected in 3 Powell, Real Property, § 411, p 424, 431; 3 Tiffany, Real Property (3rd ed), § 786, p 269. Reasonable need for the use of an easement is a flexible concept which may be described by an infinite range of circumstances; at one extreme it could mean that without the claimed right no effective use could be made of the alleged dominant estate, and at the other extreme it could mean that the use of that estate would be less convenient only. It is evident that since we cannot find the grantor's real intent, we must draw the line between absolute need and mere inconvenience at the point where it will satisfy our idea of sound policy. Broadly stated "the inference as to intention which is made is

influenced largely by considerations of public policy in favor of land utilization." 4 Restatement, Property, Servitudes, § 476, comment g.

We are not prepared to state all of the influences which are relevant in describing such a policy. We have referred to the commonly accepted view that the creation of easements by implication is not favored because they tend to fetter the servient estate, both in its development and alienation. Weighed against this, of course, are the benefits which inure to the dominant estate through the creation of such easements.

We think that the proper adjustment of the conflicting claims of the parties in this type of case can be arrived at more directly by attempting to determine what a reasonable grantee would be justified in expecting as a part of his bargain when he purchases land under the particular circumstances. Upon a division of land held under one title the grantee of the quasi dominant parcel is not entitled in every case to an easement predicated upon a previous use by the grantor. He must have reason for assuming that a right to continue the previous use of the quasi easement is a part of the bargain. In terms of necessity "the fact of such use does not justify the implication of a corresponding easement unless some necessity for the continuation of the use exists." 4 Restatement, Property, Servitudes, § 476, comment i. Since, in this class of cases, direct testimony as to the intent of the parties is absent or unsubstantial, we must come at the problem by considering whether reasonable men would regard the claimed easement as a legitimate incident of the bargain. In attempting to arrive at an answer all we can do is rely upon our understanding of the way men think and act and what they are justified in expecting under the circumstances given. Looked at in

this light, the test of reasonable necessity may be restated in terms of reasonable expectation. We do not mean to say that a conveyance of an interest in land is a bilateral transaction requiring acceptance. See 3 Tiffany, Real Property (3rd ed), § 784, p 265; 3 Powell, Real Property, § 411, p 428, Note 7. We are faced here with a problem of deciding whether an easement should be recognized under circumstances where the intent of the grantor is not ascertainable directly. Although we purport to find the grantor's intent in such cases, it is probably more accurate to say that the easement which is finally recognized through the process of construction is law created rather than grantor created. Under these circumstances, we are entitled to look at the reasonable expectations of a reasonable man receiving a conveyance of land.

■ We must consider, then, whether upon severance of the Bybee Ranch the buyer of the south tract would, as a reasonable man, be justified in assuming that the right to continue the use of the springs on the north tract was a part of his bargain. When Ryan purchased the south tract, water from the springs on the north tract was used to supply the domestic needs of the south tract. However, in addition to this source of water there was a well near the Bybee residence on the south tract.

A farm worker who had been employed by Bybee and continued on under the employment of Ryan was called as a witness by the plaintiffs. He testified that the well near the Bybee residence was not used during the time Bybee and Ryan lived there. He stated that he had never tested this well, although water came up to within ten or twelve feet of the top. He did not know whether this was underground or surface water. He also testified that there were two other wells on the

south tract, one of them approximately one third of a mile from the Bybee residence, and the other about one half a mile from the residence. These wells were used for watering stock. They had not been tested to determine the quantity or quality of water which they could supply. It was not brought out in the examination of this witness when these two wells were dug. The only other water source was Walker Creek which ran through the plaintiffs' tract, but it was not suitable for residential use. According to the witness, seepage water from the creek could have filtered into the two wells.

Hotchkiss testified that after he purchased the south tract he drilled two wells close to two other wells already on the tract. The old wells were filled with rocks apparently thrown there by children. One of the wells drilled by Hotchkiss was artesian; "a very nice producing well," as he testified. The other was "practically dry." Hotchkiss testified that he intended to use the well near the Bybee house and had borrowed a pump for this purpose. He stated that he "found that we had not a great quantity of water, but I imagine we had enough for the house." Hotchkiss sold the south tract to Dressler before completing his plan to pipe the water from the well to the house. Later, other wells were dug on the south tract by the plaintiffs to supply residences which were erected in connection with a subdivision development on that tract.

The later conduct of Hotchkiss and the plaintiffs in successfully drilling for water on the south tract is important only to show that in all likelihood there was water available on the property at the time Ryan purchased it. When he purchased his parcel he saw not only a pipe line which was supplying water to the residence, but he also saw a well nearby. The water from

the springs came to him by gravity and required no pumping. The unused well nearby could have meant to him either that it was unproductive or that Bybee preferred to use the water from the springs because it was cheaper or better, or both. Under these circumstances was it reasonable for Ryan to assume that he had a right to a continuation of the previous use? We think not. We believe that under such circumstances he had no right to assume that the water supply being used at the time of the purchase was a part of the bargain. Had there been evidence that the well would not produce water the case would be different. But in the absence of such evidence we think that the ordinary purchaser would regard the division of property as casting upon him the obligation to furnish his own supply of water if it was available on reasonable terms. If the purchaser did not know whether or not he could develop the unused well with a reasonable expenditure it would be up to him to find out.

We do have some evidence as to how one purchaser viewed the transaction when he bought the south tract. Hotchkiss stated it was his understanding that when he purchased the south tract from Ryan he was not purchasing a water right along with the land. Prior to the sale he made inquiry to determine whether a water right passed with the land. Isaacs informed him that there was no such right but that Hotchkiss could use the water as long as Isaacs did not need it. If the circumstances were such as to raise in Hotchkiss' mind a doubt as to the existence of a water right, it is not unreasonable to insist that Ryan ought to have been presented with the same doubt. Such a doubt would have imposed on him the duty of finding out whether the spring water was merely a convenience indulged in by the grantor or needed in the reasonable utilization

of the south tract. Since the plaintiffs have the burden of proof they must at least explain to us why the existing wells on the south tract could not have been developed at a reasonable cost to serve Ryan's needs.

If we should approach the solution of the problem by applying the test of reasonable necessity, two factual observations would be pertinent. The testimony of Hotchkiss tended to show that the well near the house could have been developed at a reasonable expense and, in fact, he intended to install a pump for the purpose of using the well water. Further, there was evidence that at the time Hotchkiss owned the parcel the water from the artesian well on the south tract could have been piped to the house at a cost of $600 to $800. Ordinarily, if the dominant land can be used without an easement by a reasonable expenditure the factor of necessity is lacking. Cf. 4 Restatement, Property, Servitudes, § 476, comment g. In the absence of contradicting evidence it is reasonable to assume that at the time Ryan purchased the south tract the expense of developing a water supply would not have been substantially greater. We agree with the trial judge that "it is clear from the evidence in this case that plaintiffs' predecessor in interest at the time the easement is said to have been created, could have at reasonable cost without trespassing on his neighbors created a satisfactory substitute for such easement." *Frater Oklahoma Realty Corp. v. Allen Laughon Hardware Co.,* supra; *Line v. Miller,* 309 SW2d 376 (Tenn App 1957); *Wreggitt v. Porterfield,* 36 Wash2d 638, 219 P2d 589 (1950); *Lowey v. Lowey,* 138 NYS2d 509 (1955), 3 Tiffany, Real Property (3rd ed), § 786, p 269, 272, note 42.

There was other evidence offered, both in support of and in refutation of the claim that the creation of

an easement was intended upon the severance of the Bybee Ranch. Roby Isaacs, one of the defendants, testified that it was understood between Ryan and himself prior to the conveyances to them that the north tract was not to be encumbered with a water right for the benefit of the south tract. In fact, he claimed that a handwritten agreement had been prepared by Mr. Hampton which was delivered to Ryan according to which "the intent was for me to furnish water on his ranch until he could develop water of his own, which he had more of than we had on ours, because the places were to be divided as close as possible." No explanation is given in the record why Hampton was not called to support this self-serving testimony nor why Ryan was not called by the plaintiffs to refute it if it was false.

After a painstaking examination of the record and careful consideration of the principles applicable to the facts of this case, we are of the opinion that the trial court correctly found that an easement did not arise upon the severance of the Bybee Ranch. The decree of the lower court is, therefore, affirmed.