Argued and submitted April 3, reversed and remanded in part; otherwise affirmed
November 13, 1996, petition for review denied February 4, 1997 (324 Or 560)

James L. GARRETT,
Colleen L. Rambo,
husband and wife,
and Michelle Brown,
*Appellants,*

*v.*

James MUELLER
and Carla Mueller,
husband and wife,
*Respondents.*

(9202350 CV; CA A88420)

927 P2d 612

Edmonds, J., concurred in part and dissented in part and filed opinion.

Gary L. Hedlund argued the cause and filed the brief for appellants.

Donald R. Crane argued the cause and filed the brief for respondents.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

Edmonds, J., concurring in part and dissenting in part.

**WARREN, P. J.**

Plaintiffs Colleen Rambo and Michelle Brown (plaintiffs)[1] own land in Klamath County that is directly north of land that defendants own. The issues on appeal are (1) plaintiffs' claims that they are entitled to an easement to receive water from a spring on defendants' property and (2) defendants' counterclaims to establish a right to an easement on a road through plaintiffs' property. The trial court held that defendants were entitled to an easement on the road and that plaintiffs were not entitled to continue receiving water from the spring. It entered final judgment under ORCP 67 B on the relevant claims and counterclaims. On *de novo* review,[2] we reverse on both issues.

Plaintiffs' and defendants' land (collectively, the land) is located north of Klamath Falls along Algoma Road. It was originally in common ownership. Henrietta Horn, the last owner with legal title to all of the land, received her title in 1944. She and George C. Horn, her husband, lived on the land and farmed it for many years, apparently both before and after she received title to it. The land is shaped like a boot. The major portion is a rectangle running north and south along Algoma Road; the short toe of the boot points east. A mountain rises from the eastern part of the land, with its base running from southeast to northwest. As a result, the northern portion of the land is mostly hilly, while the southern portion is primarily level. The remnants of the old Linkville to Fort Klamath Road (the Road) run along the base of

---

[1] Rambo is Brown's mother. Plaintiff James Garrett was Rambo's fiancé during part of the relevant period and is presently her husband. He does not have an ownership interest in the land.

[2] As pled, plaintiffs' claims are for damages for interference with their water easement, while defendants' counterclaims seek to restrain plaintiffs from interfering with a recorded road easement and to quiet title to a road easement by prescription. Defendants' counterclaims are equitable, while plaintiffs' claims are legal, which would normally lead to different standards of review. However, the parties tried all claims to the court, and plaintiffs did not attempt to prove their damages at the trial. We therefore conclude that the parties consented to try plaintiffs' claims as equitable claims to quiet title to the water easement. When the court found against plaintiffs on that issue, it necessarily denied their claims for damages, thus resolving their entire first and second claims and making a judgment under ORCP 67 B appropriate.

the mountain; the county abandoned it as a public road in 1914, but portions are still passable.

In 1966, Henrietta and George C. Horn[3] gave their son Tom Horn and his wife Janet Horn (the Horns) a generally trapezoidal segment of the southern portion of the land that contained approximately 5.76[4] acres (the 5.76 acres). The 5.76 acres lie along the base of the mountain; the Road runs through them.[5] The Horns lived there for some years.

Although the 5.76 acres had access to Algoma Road from the south, that access depended on the good will of a neighbor. When George and Henrietta gave that parcel to the Horns, they included in the deed an easement over their remaining land to reach Algoma Road from the north end of the 5.76 acres. However, the easement, as described in the deed, did not follow the Road north from the 5.76 acres to Algoma Road. Rather, the recorded easement was east and north of the Road, somewhere on the side of the mountain. No one knew about the discrepancy until after this litigation began; so far as the record reveals, no one has ever tried to locate the recorded easement on the land, let alone open it for use. Tom Horn and later owners of the 5.76 acres used the Road north from their property to Algoma Road in the incorrect belief that it was the recorded easement.

During the early years of the Great Depression, George C. Horn and his father developed a water supply for several buildings on the land. They found a natural spring a short distance up the mountain in the south central portion of the land, near the northeast corner of what later became the 5.76 acres. They then dug into the mountain, dammed the spring, and ran a pipe from the resulting small reservoir to the Road, just north of where it intersected what later became the northern boundary of the 5.76 acres. They then

---

[3] Although George C. Horn joined in this and other deeds during his lifetime, it is not clear that he ever had a recorded ownership interest in the land.

[4] The record and the parties are not entirely clear on the size of the parcel, referring to it as 5.73, 5.76, and 5.79 acres. Which size is correct is irrelevant to this opinion.

[5] In 1962, George and Henrietta conveyed a square parcel containing approximately 4 acres to Tom and Janet Horn, without mention of road or water easements. We have not attempted to determine if that parcel is part of the 5.76 acres. The 1962 deed does not affect our analysis of the case.

ran the pipe north along the Road to residences and barns in the north central part of the land and continued it to a service station and several cabins that fronted on Algoma Road. At some time thereafter, a short stub was installed from the pipe south to serve a house on what became the 5.76 acres. The pipe from the spring became either the sole or the primary water supply for all of the places that it served.

The deed giving the Horns title to the 5.76 acres included the easement over what they believed to be the Road and an easement to water from the spring; it was recorded in late 1966 and again in early 1967. In 1973, Tom Horn entered into an unrecorded land sale contract to purchase the remainder of the land, making his payments through an escrow at a local savings and loan. Although his parents[6] continued to live in a house on the land, he thereafter farmed it and acted in all respects as the owner of the land.

In 1978 or 1979, Tom Horn rented the northern portion of the land to Rambo, a locomotive engineer; plaintiffs then moved onto it. In 1981, plaintiffs agreed to purchase the northern 48.9 acres of the land from the Horns. Both the Road and the recorded easement go through the property that plaintiffs purchased. After the county approved a minor partition to divide the land into northern and southern portions, plaintiffs and the Horns entered into a land sale contract dated January 28, 1982. Because the Horns held only an unrecorded purchaser's interest in the land, on January 27, 1982, Henrietta deeded the northern portion to them, enabling them to convey good title to plaintiffs. Both the deed and the contract were expressly subject to the road easement described in the 1966 deed.[7] Although neither deed referred to a water easement, Tom Horn orally assured Rambo that she would continue to have a right to water and that he would provide an easement for that purpose.

In 1986, the Horns were in financial difficulty and asked plaintiffs to pay the balance of the contract ahead of

---

[6] George died sometime before 1982; Henrietta died sometime after 1986.

[7] In the earnest money agreement that preceded the land sales contract, plaintiffs promised to provide an easement "on the existing road." However, the contract and the deed both referred to the recorded easement, not to the Road.

schedule, offering a substantial discount if they did so. They accepted the offer. In conversations with Rambo at that time, Tom Horn again assured her that she would receive a water easement. However, the deed that conveyed the property, which like the contract was dated January 28, 1982, did not mention a water easement. The deed was recorded on May 7, 1986.

In January 1986, the Horns sold the 5.76 acres to Rambo's sister, Cheryl Blair, and her husband. The Blairs lived on the property together until their divorce several years later, after which Cheryl lived there by herself. She sold the 5.76 acres to defendants in November 1991. The deeds to the Blairs and to defendants referred to the road easement.

Because of his financial difficulties, Tom Horn was unable to maintain the payments on the unrecorded contract under which he was purchasing the land from Henrietta. In early 1986, Henrietta's attorney closed the escrow; thereafter, Henrietta and Tom Horn canceled the contract by mutual consent. In October 1986, Henrietta sold the remaining land (everything south of plaintiff's land except for the 5.76 acres), consisting of 66.5 acres, to defendants. As a result of their purchase of the 5.76 acres in 1991, defendants presently own the entire southern portion of the land.

Plaintiffs' house and other buildings are in the southern portion of their property, while defendants' house and other buildings are in the northern portion of theirs. Plaintiffs and defendants thus live relatively close to each other despite the size of their land holdings. From the time that plaintiffs first lived on the land until early 1992, the persons living on or owning the 5.76 acres—the Horns, the Blairs, and defendants—regularly used the Road for access to their property, with the use apparently increasing as the portion of the Road that was south of the home on the 5.76 acres deteriorated. In addition, defendants used the Road for access to their property, especially for heavy equipment or when the soil was wet, even before they purchased the 5.76 acres.[8] Although Rambo did not object to the use until this

---

[8] Defendants have an alternative, and more direct, access to Algoma Road but assert that that access is inadequate for heavy equipment when the soil is wet.

dispute arose, those using the Road did so in the mistaken belief that it was their recorded access to Algoma Road.

Neighborly relations between Rambo and defendants broke down a few years after defendants moved onto their property. Defendants shut off Rambo's water from the spring on December 15, 1991, leaving her without water for over half a year, until she was able to have a working well drilled. At about the same time, Rambo installed gates across the Road at the entrance from Algoma Road to her property and near where it leaves her property to enter defendants' land. Despite the gates, defendant James Mueller (Mueller) continued using the Road at least through January 6, 1992. On that evening, plaintiff Garrett confronted him as he drove through plaintiffs' land, told him that he was trespassing, and ordered him to leave. Mueller called 911 and a deputy sheriff was dispatched; the deputy treated the matter as a civil dispute and managed to calm things down. Sometime thereafter Rambo installed locks on the gates. On February 23, Mueller cut one of the locks, leading to another altercation that again required a deputy sheriff's presence.

Mueller testified that he stopped using the Road after Rambo installed the locks; Garrett testified that Mueller left tire tracks in the snow a couple of times after the January 6 incident. Defendants' last use of the Road, thus, was sometime between January 6, 1992, and February 23, 1992; it is impossible from this record to determine when.

■■ Plaintiffs first assign error to the trial court's determination that defendants are entitled to an easement by prescription on the Road across their land. In order to establish such an easement, defendants must prove, by clear and convincing evidence, that they or their predecessors, under a claim of right, used the Road adversely to plaintiffs' rights for a continuous and uninterrupted period of ten years. *Thompson v. Scott*, 270 Or 542, 546, 528 P2d 509 (1974). We find that any use of the Road by the owners of the 5.76 acres after plaintiffs gained the exclusive right to control access to the 48.9 acres was under a claim of right because of their mistaken belief that the Road was their recorded easement; it was therefore adverse to plaintiff's rights.[9] *See City of Ashland v. Hardesty*, 23 Or App 523, 528, 543 P2d 41 (1975),

---

[9] We do not need to consider whether defendants' use of the Road during the period before they purchased the 5.76 acres was adverse to plaintiffs or was under

*rev den* (1976). The question, then, is whether defendants and their predecessors used the Road adversely to the rights of plaintiffs for a continuous and uninterrupted period of ten years. The answer to that question depends on when the Horns' use became adverse.

■    The Horns used the Road during the entire time that plaintiffs lived on the land. However, we do not find that the Horns' use was adverse before plaintiffs purchased their property. Before 1973, the Horns' use may have been adverse to the rights of Henrietta. However, after they entered into the unrecorded land sales contract by which the Horns became the purchasers of the entire property, their use of the Road ceased to be adverse. After that time, the Horns were the equitable owners of the entire land, and their use of the Road could not be adverse to themselves. The situation did not change when the Horns rented the northern portion of the land to plaintiffs.

■    Plaintiffs' rights to exclude others from the Road thus began when they became the owners of the land through which it ran. Although plaintiffs entered into the earnest money agreement in 1981, they did not become the equitable owners until January 28, 1982. At that point the Horns' use of the Road became adverse to plaintiffs, because it was based on a claim of right derived from the recorded easement that was appurtenant to the 5.76 acres. That adversity continued during the time that the Blairs and then defendants were the owners of the 5.76 acres until early 1992, when plaintiffs clearly denied defendants' right to continue to use the Road. In our view, the adverse use was interrupted when plaintiffs installed locks on the gates. *See Thompson v. Scott,* 270 Or at 546-47.

The dissent, relying on *Restatement of Property* § 459 (1944), would require plaintiffs, in order to interrupt defendants' use, not only to install a locked gate but also to take additional actions to prevent defendants from physically overcoming that obstruction, no matter how wrongful defendants' actions might be. The dissent's proposed requirement is inconsistent with the thrust of previous Oregon cases and,

a claim of right. Defendants are entitled to the benefit of the Blairs' use of the Road during that period, and that use was based on the recorded easement.

as the facts of this case show, would tend to provoke breaches of the peace. We therefore reject it.

The dissent correctly notes that, in *Thompson v. Schuh*, 286 Or 201, 209 n 5, 593 P2d 1138 (1979), the Supreme Court treated the question of whether a locked gate interferes with a quasi-prescriptive use as an open issue. The dissent does not, however, recognize that the court had earlier suggested the answer to that question. In *Thompson v. Scott*, the defendants erected a locked gate, blocking the road. The plaintiff broke that lock, thereby continuing his access at least for a short time. The court, nevertheless, stated that the defendants "interrupted the use by erecting the gate." 270 Or at 547. That statement was consistent with the court's *dictum* in *Construction Co. v. Ditch Co.*, 41 Or 209, 220, 69 P 455 (1902), that a denial of the right, accompanied by actions that in law would be actionable as a disturbance, is sufficient to interrupt the use.[10]

The dissent relies on a decision of a majority of the North Carolina Supreme Court, *Concerned Citizens v. State ex rel. Rhodes*, 329 NC 37, 404 SE2d 677 (1991), in support of its position. We believe that that opinion simply illustrates the dangers of breach of the peace that the dissent's approach would produce. In *Concerned Citizens*, the landowner made escalating efforts to stop the public from trespassing on its land under a claimed right of use, each effort only increasing its frustration. The landowner first put up "No Trespassing" signs; the public used the signposts for firewood. It then placed a telephone pole across the road; the public drove around. Its next step was a padlocked cable that eventually grew to 200 feet long in a vain attempt to stop the public from bypassing it. The cable was followed by locked gates, a guardhouse, and guards, all of which proved unavailing.

Rather than being relieved that the landowner did not bring in the tank or machine gun that it suggested would be the logical next step, the majority treated this persistent trespassing as proof of the adversity of the public's use. The

---

[10] In *Kondor v. Prose*, 50 Or App 55, 622 P2d 741 (1981), the defendants erected a gate to keep their cattle in, not to bar the plaintiffs' predecessor's passage. After it was locked, plaintiffs' predecessor had a key to the lock. The gate, thus, did not interrupt the use, because it was not actionable as a disturbance.

three dissenting judges sensibly pointed out that the landowner's actions permitted a finding that it had prevented full and free enjoyment of the quasi-easement. They could also have noted that those actions challenged the public's asserted claim of a right to use the quasi-easement and gave the public a right of action against the landowner to enforce the easement, if it actually existed. Once the landowner had made that challenge, the public's recourse was to initiate a legal action to determine its rights, not to provoke physical confrontations with the landowner.

■ Oliver Wendell Holmes, Jr., writing for the Massachusetts Supreme Judicial Court almost a hundred years ago, correctly stated what a landowner must do to interrupt a prescriptive use. The question in *Brayden v. New York, N.H. & H. R. Co.*, 172 Mass 225, 51 NE 1081 (1898), was whether a railroad track had become a public way by prescription. The railroad company had obstructed a hole in a fence along its track within the prescriptive period, but the obstructions were soon torn down. Nevertheless, the court held that those obstructions interrupted the use; it did not require proof that they had actually prevented anyone from using the track. As Justice Holmes explained:

> "We are of opinion that such an assertion of right on the part of the railroad company was sufficient to prevent the gaining of a right of way. *A landowner, in order to avoid that result, is not required to battle successfully for his rights.* It is enough if he asserts them to the other party by *an overt act, which, if the easement existed, would be a cause of action.* Such an assertion interrupts the would-be dominant owner's impression of acquiescence, and the growth in his mind of a fixed association of ideas; or, if the principle of prescription be attributed solely to the acquiescence of the servient owner, it shows that the acquiescence was not a fact." 51 NE at 1081-82 (emphasis supplied).

That rule is consistent with the Supreme Court's decisions in *Construction Co.* and *Thompson v. Scott* and is best designed to bring the dispute into court for peaceful resolution.[11]

---

[11] The landowner can, of course, interrupt the use by filing a successful action asserting its rights. We do not see any reason, however, that the landowner should be required to initiate legal action. By obstructing the use, the landowner may require those who are using the quasi-easement under a claim of right to bring an action to vindicate that claimed right in court.

In this case, the evidence shows that plaintiffs had not locked their gates or otherwise used them to stop defendants from using the road before January 6, 1992, and that they had locked them by February 23, when Mueller cut the lock off. The first date was less than ten years after the use became adverse, while the second date was more than ten years afterwards. In light of the nature of the altercation on January 6 and the general deterioration of the relationship between the parties, it is likely that plaintiffs installed the locks soon after January 6 and before January 28. In any event, we cannot say that defendants have proved by clear and convincing evidence that they and their predecessors in title to the 5.76 acres used the Road adversely to plaintiff's interests from January 28, 1982, through January 28, 1992, without interruption.

Plaintiffs interrupted defendants' use when, after telling Mueller that he was trespassing, they locked the gates to stop him.[12] If defendants actually had a right to use the Road, that action gave them a claim against plaintiffs that a court could enforce. *See Abbott v. Thompson*, 56 Or App 311, 317, 641 P2d 652, *rev den* 293 Or 103 (1982). Because we cannot find that plaintiffs first locked the gates after the prescriptive period had run, the effect of their action was to interrupt the use and prevent the creation of an easement by prescription. Defendants have therefore failed to prove their claim to a prescriptive easement over the Road.[13]

██ Plaintiffs next assign error to the court's failure to hold that they are entitled to an easement to water from the spring. They base their argument on a number of theories, but the only one that we need to consider is that of an implied easement.[14] An implied easement may arise when the owner

---

[12] The dissent argues that we have shifted the focus from the mind-set of the prescriptive user to that of the servient owner. 144 Or App at 346. It fails to note that that shift is inherent in the concept of "interruption." Although the requirement that the prescriptive use be open, hostile, actual, and continuous focuses on the actions and attitude of the prescriptive user, whether the use has been interrupted necessarily focuses on the actions of the servient owner. *See* 25 Am Jur 2d, *Easements*, § 69 (1996).

[13] We agree with the trial court that plaintiffs have failed to prove that defendants abandoned the recorded easement; there is no evidence of an intention to abandon it. *See Conner v. Lucas*, 141 Or App 531, 538, 920 P2d 171 (1996).

[14] Although plaintiffs did not plead an implied easement, without objection from defendants they discussed it in their trial memorandum, referred to it in their

of land held under one title conveys part of the land to another. If there was a previous apparent and permanent use of the land that is important for the enjoyment of the parcel that the common owner sold, the courts may imply that the purchaser received an easement, measured by the pre-existing use, over the parcel that the common owner retained. Although there are many factors to consider, the essential question is whether a reasonable purchaser would be justified in expecting the easement under the circumstances in which he or she purchased the land. There must be a reason for assuming that a right to continue using the quasi-easement is part of the bargain. *Dressler et al v. Isaacs et al*, 217 Or 586, 596-99, 343 P2d 714 (1959).

In *Dressler*, which also involved an attempt to establish an implied easement for water, the court discussed the relevant factors in some detail and ultimately determined that the plaintiff was not entitled to an implied easement. In this case the facts are sufficiently different that the result is also different.[15] When plaintiffs purchased their property, it had received water from the spring for fifty years. They had used the water while Rambo rented it from the Horns. They purchased the property in order to continue living on it; continuing to receive water from the spring and pipe, thus, was essential to achieving the purpose for which they entered into the bargain. The only wells existing on the property that plaintiffs purchased were completely inadequate to the needs of anyone who might occupy it. Their grantors, the Horns, knew of their use of the water and of its importance to them. Tom Horn, in fact, promised to provide them an express easement, although he failed to carry through on the promise. In these circumstances, an easement to continue using the water was an essential part of the deal; we find, under these facts, that there is an implied easement.

We hold, thus, that defendants have failed to prove that they obtained an easement by prescription over the Road; that, on the other hand, plaintiffs have failed to prove

argument to the trial court and introduced relevant evidence. The parties tried the issue by consent. ORCP 23 B.

[15] Indeed, defendants' only argument in opposition to plaintiffs' implied easement claim is that they did not raise it in their pleadings; they do not argue against it on the merits.

that defendants have abandoned the recorded easement; and that plaintiffs have proved their right to an implied easement to receive water from the spring on defendants' land.

Judgment for defendants on claim for easement by prescription reversed; judgment for defendants on plaintiffs' claim for interference with water easement and for damages to water easement reversed and remanded for determination of plaintiffs' claims for damages; otherwise affirmed.

**EDMONDS, J.,** concurring in part and dissenting in part.

I concur with the majority's analysis regarding the claim for the establishment of an easement for water but I disagree with its analysis that defendants are not entitled to a prescriptive road easement, because it leads to a departure from the common law of prescriptive easements.

The majority holds that defendants have not proven by clear and convincing evidence that they used the road in an uninterrupted adverse manner for a period of ten years. The majority is wrong factually. Defendants' adverse use began on January 28, 1982. Unless their use was effectively interrupted before January 28, 1992, they have met the ten-year period of use requirement. In November 1991, plaintiff Rambo erected a gate across the road because "[defendants'] cattle were trespassing on my property daily." Plaintiff Garrett testified, "[the reason] Colleen and I both put the gates was not to stop the Muellers per se * * * [rather] [i]t was to keep their cows from coming over on the property, because they were constantly over there every single day." After the gates were installed, it is uncontradicted that defendants continued to use the road. Mueller testified, "I just opened them and went through them until they locked them." In *Kondor v. Prose*, 50 Or App 55, 60, 622 P2d 741 (1981), we held that the erection of a gate to keep the defendants' cattle out did not interrupt the adverse use of the road when there was no evidence that the users discontinued their use because of the gate. The same rule applies here.

On January 6, 1992, there was a confrontation between Garrett and James Mueller. Garrett testified that

he told Mueller not to use the road anymore. Sometime thereafter, plaintiffs locked the gates. It is uncontradicted that after the gates were locked, Mueller cut the locks and continued to use the road. Mueller testified that "I continued using that road until they started blocking it off completely with their automobiles." Rambo confirmed Mueller's testimony: "I know [Mueller] used [the road] at least twice after * * * he cut that lock off."

Plaintiffs were finally able to stop defendants' use by blocking the road with their automobiles. The date when plaintiffs finally interrupted the adverse use of the road by defendants with their automobiles is ascertainable with relative certainty. It occurred around the time that Mueller contacted the sheriff's office or approximately February 23, 1992. Under those circumstances, the ten-year period expired and the prescriptive easement vested in defendants before plaintiffs were able to interrupt the adverse use.

Plaintiffs can only prevail if the ineffectual locking of the gates in early January sufficed as a matter of law to interrupt the prescriptive period. What rule of law is applied to the facts of this case is crucial to its outcome. Under the majority's view of the law, defendants lose because, two or three weeks before the ten-year period was to expire, plaintiffs locked the gates. It is immaterial, according to the majority, that Mueller thereafter broke the locks and continued to use the road. The issue presented by these facts is of first impression in Oregon.

In *Thompson v. Schuh*, 286 Or 201, 593 P2d 1138 (1979), the plaintiffs asserted in oral argument that when the defendant installed a locked chained gate, it didn't block their use so as to interrupt the prescriptive period. The court said:

"We need not decide this issue as there is no evidence that [plaintiff] did go around any gates, his testimony being, rather, that there were no gates until 1975. Also, while it is true that ineffective protests do not succeed in interrupting the prescriptive period, if the servient owner does some act that would be legally actionable if an easement did in fact

exist, *that perhaps may be sufficient to break the prescriptive period.*" *Id.* at 209 n 5 (emphasis supplied; citations omitted).

The reliance of the majority on the holding in *Thompson v. Scott*, 270 Or 542, 528 P2d 509 (1974), for the proposition that the Supreme Court earlier had "suggested the answer to [the] question" stretches credulity. 144 Or App at 338. In *Thompson v. Scott*, the issue was whether an initially permitted use had been changed into an adverse use. The issue of what act caused a cessation of the period of time for which the prescriptive use was claimed was not in issue nor is it analyzed in the opinion. The opinion does mention in the statement of facts that the plaintiff broke the lock of the gate erected by the defendants. Then, the court notes later in the opinion that the use before 1960 was permissive or irregular. The court then summarizes the issue: "Thus, to make out their case plaintiffs must establish a continuous use for ten years sometime within the period from 1960 to 1972, when defendants interrupted the use by erecting the gate." 270 Or at 547. Thereafter, there is no mention in the opinion of any discussion about whether it was the erection of the gate or the breaking of the lock that caused the cessation of the use because the use was not deemed prescriptive. Interestingly, the Supreme Court still considered the issue to be undecided five years later when it decided *Thompson v. Schuh*.

Because we are now faced with the issue that was left undecided in *Thompson v. Schuh*, it is important to remember what is involved in the acquisition of a prescriptive right. In general, the very nature of prescriptive use connotes an element of hostility by the user against the servient estate that says in effect, "I intend to use the road despite the ownership of the servient owner." That hostile intent must continue uninterrupted throughout the prescriptive period. The *Restatement of Property* defines an uninterrupted adverse use:

"(2) An adverse use is uninterrupted when those against whom the use is adverse do not

"(a)   bring and pursue to judgment legal proceedings in which the use is determined to be without legal justification, or

"(b)   *cause a cessation of the use* without the aid of legal proceedings." 5 *Restatement of Property* (Servitudes) § 459 (1944).

In comment c to section 459, the *Restatement* provides:

"An act by the possessor of land intended to cause a cessation of use does not produce an interruption of use unless a cessation of use, temporarily at least, results. The success of the act in causing a cessation of use rather than its form or manner determines its effect as an interruption."

In this case, there was no cessation of adverse use by defendants until after the ten-year period had lapsed within the meaning of the *Restatement.*

The majority's reliance on *Construction Co. v. Ditch Co.*, 41 Or 209, 220, 69 P 455 (1902), for the proposition that any act that will amount to a legally cognizable disturbance of a property interest suffices to act as a cessation of use is misplaced. In that case, the issue was whether a purported interruption of the continuity of the diversion of irrigation water sufficed to defeat the user's claim to the water. The interruption, according to the court, amounted to nothing more than the mere denial of the user's right to use the water. In holding that there had been no effective cessation of use, the court stated:

"Mere denials of the right, complaints, remonstrances, or prohibitions of user, unaccompanied by any act which in the law would amount to a disturbance, and be actionable as such, will not prevent the acquisition of a right by prescription." *Id.* (Citations omitted.)

The facts in this case differ significantly. Here, there was an ineffectual attempt to interrupt the use followed by a successful effort to continue the prescriptive use. The holding in *Construction Co.* that a mere denial unaccompanied by an act that gives rise to a legal action will not prevent the acquisition of a prescriptive right does not translate to a pronouncement that an ineffectual interruption that could give

rise to a legal action suffices to operate as a cessation of prescriptive rights. At most, the above language illustrates why something more than a mere denial of a prescriptive right is required to constitute a cessation of use.

Several other jurisdictions have wrestled with the issue that is before us and have arrived at conclusions consistent with the *Restatement*. One of the most interesting discussions appears in *Concerned Citizens v. State ex rel Rhodes*, 329 NC 37, 404 SE2d 677 (1991). In that case, a citizens' association brought a declaratory judgment action against a landowner to obtain public access to a beach. The court held that the public's use of the road was sufficiently continuous and uninterrupted for the prescriptive period to establish the easement. Through that period, the landowner had endeavored unsuccessfully to block access by posting as many as 50 "no trespassing" signs, employing a telephone pole barrier, a padlocked cable, locked gates, barricades and guards. The property owner's frustration at the failure of his efforts to stop public use was expressed by testimony of his agent at trial: "[H]ave you got to set a tank up, a machine gun, or what[?]" *Id.* at 51, 404 SE2d at 686.

The court held that effectively to defeat a prescriptive right, an extra-judicial interruption of the use must be accompanied by some act of the owner that "*prevents* the use of the easement." *Id.* at 52, 404 SE2d at 686. The evidence of the removal or circumvention of the barriers to access to the property is simply further evidence of hostility under the law of prescriptive easements and does not support a conclusion that the owner successfully interrupted the adverse use. Other jurisdictions have held similarly. *See, e.g., Trustees of ForestGreen Estates, 4th Addition v. Minton*, 510 SW2d 800, 803 (Mo Ct App 1974); and *Guerra v. Packard*, 236 Cal App 2d 272, 46 Cal Rptr 25 (1965).

Not only is the majority's holding contrary to the *Restatement* and the holdings of these other courts, but also it switches the focus of the law from the mind-set of the prescriptive user to that of the servient owner and blurs what had previously been a commonly understood principle of the common law of prescriptive easements. The common-law requirement of an open, hostile, actual, continuous use refers

to the attitude of the mind of the prescriptive user. *Arrien v. Levanger*, 263 Or 363, 369, 502 P2d 573 (1972). Assuming that that initial requirement is met, all that need occur to establish the right is the expiration of the prescribed time period without an actual cessation of use. Under the majority's ruling, the common law is changed because the focus is now on what the servient owner intends. Regardless of the continuation of hostile use by the prescriptive user, the prescriptive right is lost because of an ineffectual interruption by the servient owner. Under the majority's precedent, a mere entry on the easement, the posting of signs on the property or other minimal interference with property rights that give rise to a legal action will suffice to constitute a disturbance of the acquisition of possessory rights that arise from the prescriptive use. That has never been the common law and should not become the law of this state. The requirement that there be a cessation of use in order to interrupt a prescriptive right provides a clarity in the law that constitutes a clear demarcation of what a prescriptive user must do to preserve the right and what a servient owner must do to interrupt it.

The majority worries that following the *Restatement* rule will serve to engender violent confrontations. To the contrary, the adherence to the law of the *Restatement* clarifies that the only sure way to interrupt a period of prescriptive use is to seek judicial intervention. Otherwise, servient owners, to their peril, are left to self-help remedies which later may prove ineffective. Had plaintiffs sought judicial recourse instead of the futile effort of locking the gates, they would not be here today. In sum, the common law requiring a cessation of use is well founded in the policy of motivating Oregon citizens to seek judicial help, a policy worth keeping and promoting.