McGEE, Chief Judge.
 

 *81
 
 Gregory P. Nies and Diane S. Nies ("Plaintiffs") purchased an oceanfront property ("the Property") in Defendant Town of Emerald Isle ("the Town") in June of 2001. Plaintiffs had been vacationing in the Town from their home in New Jersey since 1980. Plaintiffs filed this matter alleging the inverse condemnation taking of the Property by the Town.
 

 *82
 
 I
 

 "Generally speaking, state law defines property interests[.]"
 
 Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection,
 

 560 U.S. 702
 
 , 707-08,
 
 130 S.Ct. 2592
 
 , 2597,
 
 177 L.Ed.2d 184
 
 , 192 (2010) (citations omitted). North Carolina's ocean beaches are made up of different sections, the delineation of which are important to our decision.
 
 Fabrikant v. Currituck Cty.,
 

 174 N.C.App. 30
 
 , 33,
 
 621 S.E.2d 19
 
 , 22 (2005). The "foreshore," or "wet sand beach," is the portion of the beach covered and uncovered, diurnally, by the regular movement of the tides.
 

 Id.
 

 The landward boundary of the foreshore is the mean high water mark. "Mean high water mark" is not defined by statute in North Carolina, but our Supreme Court has cited to a decision of the United States Supreme Court in discussing the meaning of the "mean" or "average high-tide."
 
 Fishing Pier, Inc. v. Town of Carolina Beach,
 

 277 N.C. 297
 
 , 303,
 
 177 S.E.2d 513
 
 , 516 (1970). The United States Supreme Court decision cited by
 
 Fishing Pier
 
 defined "mean high tide" as the average of all high tides over a period of 18.6 years.
 
 Borax Consol. v. City of Los Angeles,
 

 296 U.S. 10
 
 , 26-27,
 
 56 S.Ct. 23
 
 , 31,
 
 80 L.Ed. 9
 
 , 20 (1935).
 
 [1]
 

 The "dry sand beach" is the portion of the beach landward of the mean high water mark and continuing to the high water mark of the storm tide.
 
 Fabrikant,
 

 174 N.C.App. at 33
 
 ,
 
 621 S.E.2d at 22
 
 . The landward boundary of the dry sand beach will generally be the foot of the most seaward dunes, if dunes are present; the regular natural vegetation line, if natural vegetation is present; or the storm debris line, which indicates the highest regular point on the beach where debris from the ocean is deposited at storm tide. Travelling further away from the ocean past the dry sand beach one generally encounters dunes, vegetation, or some other landscape that is not regularly submerged beneath the salt waters of the ocean.
 

 The seaward boundary of private beach
 
 ownership
 
 in North Carolina is set by statute:
 

 *191
 
 (a) The seaward boundary of all property within the State of North Carolina, not owned by the State, which adjoins the ocean, is the mean high water mark. Provided, that this section shall not apply where title below the mean high water mark is or has been specifically granted by the State.
 

 *83
 
 (b) Notwithstanding any other provision of law, no agency shall issue any rule or regulation which adopts as the seaward boundary of privately owned property any line other than the mean high water mark. The mean high water mark also shall be used as the seaward boundary for determining the area of any property when such determination is necessary to the application of any rule or regulation issued by any agency.
 

 N.C. Gen.Stat. § 77-20 (2013).
 

 None of these natural lines of demarcation are static, as the beaches are continually changing due to erosion or accretion of sand, whether through the forces of nature or through human intervention. Furthermore, the State may acquire ownership of public trust
 
 dry sand
 
 ocean beach if public funds are used to raise that land above the mean high water mark:
 

 Notwithstanding the other provisions of this section, the title to land in or immediately along the Atlantic Ocean raised above the mean high water mark by publicly financed projects which involve hydraulic dredging or other deposition of spoil materials or sand vests in
 
 the State.
 
 Title to such lands raised through projects that received no public funding vests in the adjacent littoral proprietor.
 
 All such raised lands shall remain open to the free use and enjoyment of the people of the State, consistent with the public trust rights in ocean beaches, which rights are part of the common heritage of the people of this State.
 

 N.C. Gen.Stat. § 146-6(f) (2013) (emphasis added).
 

 The Town, from time to time, has engaged in beach "nourishment" projects. The purpose of these projects has been to control or remediate erosion of the Town's beaches. The Town embarked on one such project in 2003 ("the Project"). According to Plaintiffs, the result of the Project was an extension of the dry sand beach from Plaintiffs' property line-the pre-Project mean high water mark-to a new mean high water mark located seaward of their property line. Therefore, the State now owns dry sand beach-which it holds for the public trust-between Plaintiffs' property line and the current mean high water mark-which no longer represents Plaintiffs' property line.
 

 The Town was incorporated in 1957. The public has enjoyed access to its beaches, including both the publicly-owned foreshore-or wet
 
 *84
 
 sand beach-and the private property dry sand beaches, since at least that date. This access has included fishing (both commercial and recreational), sunbathing, recreation, horseback riding, and the driving of automobiles upon the beach strand. According to the unchallenged affidavit of Frank Rush ("Rush") who, at the time of the summary judgment hearing, had been the Town's Town Manager since July 2001, "[b]each driving has been allowed within the Town since its incorporation in 1957." Rush averred that, since at least 1980, the Town had been restricting beach driving within its borders to a "permitted driving area," which was defined in the Emerald Isle Code of Ordinances (Oct. 2010) ("the Ordinances" generally, or "the 2010 Ordinances" specifically). According to the minutes of the 9 December 1980 Regular Monthly Meeting of the Emerald Isle Town Board of Commissioners, which meeting was open to the public, beach driving in the Town was regulated by the Carteret County Beach Vehicular Ordinance at that time. In this 9 December 1980 meeting of the Board of Commissioners, the Board voted to rescind use of the Carteret County Beach Vehicular Ordinance and "re-adopt [the Town's] original Beach Vehicular Ordinance[.]" The record does not contain the Carteret County Beach Vehicular Ordinance, or any pre-1980 ordinances related to beach driving.
 

 According to Plaintiffs: "Historically, the [Ordinances] permitted public driving on"
 

 the foreshore and area within the [T]own consisting primarily of hardpacked sand and lying
 
 between the waters of the Atlantic
 

 *192
 

 Ocean ... and a point ten (10) feet seaward from the foot or toe of the dune closest to the waters of the Atlantic Ocean[.]
 

 This is the language from Section 5-21 of the 2010 Ordinances, and accurately reflects the defined permitted driving area from the time Plaintiffs purchased the Property in June of 2001 until the filing of this action on 9 December 2011. This statement also constitutes an acknowledgement by Plaintiffs that, "historically," the public has been driving on private property dry sand beach, and that this behavior has been regulated by the Town. However, the ordinances "allowing" driving on the designated driving areas were in fact restrictive, not permissive, in that they restricted previously allowed behavior and did not create any new rights:
 

 Sec. 5-22. Driving on beach and sand dunes prohibited: exceptions.
 

 It shall be unlawful for any vehicular traffic to travel upon the beach and sand dunes located within the town
 
 *85
 
 between 9 pm on April 30 and 5 am on September 15. .... This does not apply to commercial fisherm[e]n holding valid state licenses while engaged in commercial fishing activities.
 

 Sec. 5-23. Driving on designated areas only.
 

 It shall be unlawful for any vehicular traffic holding and displaying a duly authorized permit issued pursuant to this article to travel on any portion of the beach and sand dune areas other than those areas designated herein as permitted driving areas and the limited access ways as defined in section 5-21.
 

 Emerald Isle Code of Ordinances §§ 5-22, 5-23 (Aug. 2004). The 1980 ordinances contained similar restrictive language related to beach driving. The Ordinances appear to have been adopted to regulate pre-existing behavior, not to permit new behavior.
 

 In 2010, the Town adopted some new sections to the Ordinances, including Section 5-102, which stated:
 

 (a) No beach equipment, attended or unattended, shall be placed within an area twenty (20) feet seaward of the base of the frontal dunes at any time, so as to maintain an unimpeded vehicle travel lane for emergency services personnel and other town personnel providing essential services on the beach strand.
 

 Emerald Isle Code of Ordinances § 5-102 (Jan. 2010). "Beach strand" was defined by the 2010 Ordinances as "all land between the low water mark of the Atlantic Ocean and the base of the frontal dunes." Emerald Isle Code of Ordinances § 5-100 (Jan. 2010). Section 5-104 stated that any beach equipment found in violation of the Ordinances would be removed and disposed of by the Town, and could result in fines. Emerald Isle Code of Ordinances § 5-104 (Jan. 2010). According to Plaintiffs, Town and other permitted vehicles regularly drive over, and sometimes park on, the dry sand beach portion of the Property.
 

 In 2013, subsequent to the filing of this action, the Town amended the Ordinances, completely reorganizing the contents of Chapter 5. For example, prohibitions previously found in Section 5-102 of the 2010 Ordinances are now found in Section 5-19 of the 2013 Ordinances. Section 5-1 of the 2013 Ordinances states: "Unless otherwise noted, this chapter shall be applicable on the public trust beach area, as defined by NCGS 77-20, and includes all land and water area between the Atlantic Ocean
 
 *86
 
 and the base of the frontal dunes." Emerald Isle Code of Ordinances § 5-1 (Oct. 2013). Sections 5-60 and 5-61 of the 2013 Ordinances limit driving on "the public trust beach area" to certain time periods, and restrict driving on these areas to permitted vehicles. Emerald Isle Code of Ordinances §§ 5-60, 5-61 (Oct. 2013). Permits are issued to qualified applicants by the Town Manager. Emerald Isle Code of Ordinances § 5-61 (Oct. 2013). Though the language used in Section 5-19 of the 2013 Ordinances differs in some respects from the previous language found in Section 5-102 of the 2010 Ordinances, Section 5-19 still reserves an unimpeded twenty-foot-wide strip along the beach measured seaward from the foot of the frontal dunes. Plaintiffs' action is not materially affected by the 2013 amendment to the Ordinances. Relevant to this appeal, Plaintiffs claim that the effect of the contested Ordinances was the taking of the
 
 *193
 
 dry sand beach portion of the Property by the Town.
 

 Plaintiffs, along with other property owners not parties to this appeal, filed this action on 9 December 2011. The complaint alleged,
 
 inter alia,
 
 violation of the Takings Clause of the Fifth Amendment of the United States Constitution. The Town moved for summary judgment on 25 July 2014. Summary judgment in favor of the Town was granted by order entered 26 August 2014, and Plaintiffs' action was dismissed. Plaintiffs appeal.
 

 II.
 

 Plaintiffs' sole argument on appeal is that the trial court erred in granting summary judgment in favor of the Town because the contested ordinances effected a taking of the Property in violation of the Takings Clause of the Fifth Amendment. In support of their argument, Plaintiffs contend that the dry sand ocean beach portion of their property is not subject to public trust rights.
 

 Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2013). We review de novo an order granting summary judgment.
 

 Falk v. Fannie Mae,
 

 367 N.C. 594
 
 , 599,
 
 766 S.E.2d 271
 
 , 275 (2014) (citation omitted). We affirm the ruling of the trial court.
 

 *87
 
 III.
 

 Plaintiffs first argue that privately owned dry sand beaches in North Carolina are not subject to the public trust doctrine. We disagree.
 

 Our Supreme Court has noted that "the law involving the public trust doctrine has been recognized ... as having become unnecessarily complex and at times conflicting."
 
 Gwathmey v. State of North Carolina,
 

 342 N.C. 287
 
 , 311,
 
 464 S.E.2d 674
 
 , 688 (1995). The public trust doctrine is a creation of common law.
 
 Fabrikant,
 

 174 N.C.App. at 41
 
 ,
 
 621 S.E.2d at 27
 
 . Our General Assembly has codified recognition of the continuing legal relevance of common law in the State:
 

 N.C.G.S. § 4-1 provides:
 

 All such parts of the common law as were heretofore in force and use within this State, or so much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, and which has not been otherwise provided for in whole or in part, not abrogated, repealed, or become obsolete, are hereby declared to be in full force within this State.
 

 Gwathmey,
 

 342 N.C. at 295-96
 
 ,
 
 464 S.E.2d at 679
 
 .
 

 [T]he "common law" to be applied in North Carolina is the common law of England to the extent it was in force and use within this State at the time of the Declaration of Independence; is not otherwise contrary to the independence of this State or the form of government established therefor; and is not abrogated, repealed, or obsolete. N.C.G.S. § 4-1. Further, much of the common law that is in force by virtue of N.C.G.S. § 4-1
 
 may be modified or repealed by the General Assembly,
 
 except that any parts of the common law which are incorporated in our Constitution may be modified only by proper constitutional amendment.
 

 Id.
 
 at 296,
 
 464 S.E.2d at 679
 
 (emphasis added);
 
 see also
 

 Shively v. Bowlby,
 

 152 U.S. 1
 
 , 14,
 
 14 S.Ct. 548
 
 , 553,
 
 38 L.Ed. 331
 
 , 337 (1894) ("The common law of England upon this subject, at the time of the emigration of our ancestors, is the law of this country, except so far as it has been modified by the charters, constitutions, statutes, or usages of the several colonies and states, or by the constitution and laws of the United States.").
 

 *88
 
 The General Assembly has the power to make or amend laws so long as those laws do not offend the constitutions of our State or the United States. As our Supreme Court has recognized:
 

 "(U)nder our Constitution, the General Assembly, so far as that instrument is concerned, is possessed of full legislative powers unless restrained by express constitutional provision or necessary implication
 
 *194
 
 therefrom." Absent such constitutional restraint, questions as to public policy are for legislative determination. When the constitutionality of a statute is challenged, "every presumption is to be indulged in favor of its validity."
 

 Martin v. Housing Corp.,
 

 277 N.C. 29
 
 , 41,
 
 175 S.E.2d 665
 
 , 671 (1970) (citations omitted).
 

 This Court has recognized both public trust lands and public trust
 
 rights
 
 as codified by our General Assembly:
 

 The public trust doctrine is a common law principle providing that certain land associated with bodies of water is held in trust by the State for the benefit of the public. As this Court has held, "public trust rights are 'those rights held in trust by the State for the use and benefit of the people of the State in common. .... They include, but are not limited to, the right to navigate, swim, hunt, fish and enjoy all recreational activities in the watercourses of the State and the right to freely use and enjoy the State's ocean and estuarine beaches and public access to the beaches.' "
 
 Friends of Hatteras Island Nat'l Historic Maritime Forest Land Trust for Pres., Inc. v. Coastal Res. Comm'n,
 

 117 N.C.App. 556
 
 , 574,
 
 452 S.E.2d 337
 
 , 348 (1995) (emphasis omitted) (quoting N.C. Gen.Stat. § 1-45.1 (1994) ).
 

 Fabrikant,
 

 174 N.C.App. at 41
 
 ,
 
 621 S.E.2d at 27
 
 (citation omitted). Public trust rights are associated with public trust lands, but are not inextricably tied to ownership of these lands. For example, the General Assembly may convey ownership of public trust land to a private party, but will be considered to have retained public trust rights in that land unless specifically relinquished in the transferring legislation by "the clearest and most express terms."
 
 Gwathmey,
 

 342 N.C. at 304
 
 ,
 
 464 S.E.2d at 684
 
 . Public trust rights are also attached to public trust resources which, according to our General Assembly, may include both public and private lands:
 

 *89
 
 "public trust resources" means land and water areas,
 
 both public and private,
 
 subject to public trust rights as that term is defined in G.S. 1-45.1.
 

 N.C. Gen.Stat. § 113-131(e) (2013) (emphasis added). As noted above, N.C. Gen.Stat. § 1-45.1 defined public trust rights as including the "right to freely use and enjoy the State's ocean and estuarine beaches and public access to the beaches."
 
 Fabrikant,
 

 174 N.C.App. at 41
 
 ,
 
 621 S.E.2d at 27
 
 (citation and quotation marks omitted). This Court has adopted the N.C. Gen.Stat. § 1-45.1 definition of public trust rights.
 

 Id.
 

 Concerning "ocean beaches," the General Assembly has found:
 

 The public has traditionally fully enjoyed the State's beaches and coastal waters and public access to and use of the beaches and coastal waters. The beaches provide a recreational resource of great importance to North Carolina and its citizens and this makes a significant contribution to the economic well-being of the State. The General Assembly finds that the beaches and coastal waters are resources of statewide significance and have been customarily freely used and enjoyed by people throughout the State.
 

 N.C. Gen.Stat. § 113A-134.1(b) (2013). The General Assembly considers access to, and use of, ocean beaches to be a public trust right. N.C. Gen.Stat. § 1-45.1 ; N.C. Gen.Stat. § 113A-134.2 (2013). This Court has indicated its agreement.
 
 Fabrikant,
 

 174 N.C.App. at 41
 
 ,
 
 621 S.E.2d at 27
 
 .
 

 N.C. Gen.Stat. § 77-20(e) defines "ocean beaches" as follows:
 

 "[O]cean beaches" means the area adjacent to the ocean and ocean inlets that is
 
 subject to public trust rights.
 
 This area is in constant flux due to the action of wind, waves, tides, and storms and
 
 includes the wet sand area of the beach that is subject to regular flooding by tides and the dry sand area of the beach that is subject to occasional flooding by tides,
 
 including wind tides other than those resulting from a hurricane or tropical storm. The landward extent of the ocean beaches is established by the common law as interpreted and applied by the courts of this State. Natural indicators of the landward extent of the ocean beaches include, but are not limited to, the first line of stable, natural vegetation; the toe of the frontal dune; and the storm trash line.
 

 *195
 

 *90
 
 N.C. Gen.Stat. § 77-20(e) (emphasis added). Having attempted to define "ocean beaches," N.C. Gen.Stat. § 77-20(d) further states the position of the General Assembly that the public trust portions of North Carolina ocean beaches include the dry sand portions of those beaches:
 

 The public having made frequent, uninterrupted, and unobstructed use of the
 
 full width and breadth of the ocean beaches of this State from time immemorial,
 
 this section shall not be construed to impair the
 
 right of the people to the customary free use and enjoyment of the ocean beaches, which rights remain reserved to the people of this State under the common law and are a part of the common heritage of the State recognized by Article XIV, Section 5 of the Constitution of North Carolina. These public trust rights in the ocean beaches are established in the common law as interpreted and applied by the courts of this State.
 

 N.C. Gen.Stat. § 77-20(d). N.C. Gen.Stat. § 77-20 was last amended in 1998, before Plaintiffs purchased the Property.
 

 The Executive Branch, through a 1996 opinion of the Attorney General, also adopted this assessment.
 

 Because the public ownership stops at the high water line, the public must either be in the water or on the dry sand beach when the tide is high. The term "dry sand beach" refers to the flat area of sand seaward of the dunes or bulkhead which is flooded on an irregular basis by storm tides or unusually high tides.
 
 It is an area of private property which the State maintains is impressed with public rights of use under the public trust doctrine and the doctrine of custom or prescription.
 

 Opinion of Attorney General Re: Advisory Opinion Ocean Beach Renourishment Projects,
 

 N.C.G.S. § 146-6(f),
 

 1996 WL 925134
 
 , *2 (Oct. 15, 1996) ("Advisory Opinion") (emphasis added) (citation omitted);
 
 See also
 
 15A N.C.A.C. 7M.0301 (2015) (wherein the Department of Environment and Natural Resources expresses a similar view).
 

 The General Assembly has made clear its understanding that at least some portion of privately-owned dry sand beaches are subject to public trust rights. The General Assembly has the power to make this determination through legislation, and thereby modify any prior common law understanding of the geographic limits of these public trust rights.
 
 Gwathmey,
 

 342 N.C. at 296
 
 ,
 
 464 S.E.2d at 679
 
 .
 

 *91
 
 There is, however, potential ambiguity in the definition of "ocean beaches" provided in N.C. Gen.Stat. § 77-20(e) :
 

 The landward extent of the ocean beaches is established by the common law as interpreted and applied by the courts of this State. Natural indicators of the landward extent of the ocean beaches include, but are not limited to, the first line of stable, natural vegetation; the toe of the frontal dune; and the storm trash line.
 

 N.C. Gen.Stat. § 77-20(e). A thorough search of the opinions of this Court and our Supreme Court fails to uncover any holding establishing the landward extent of North Carolina's ocean beaches. Further, it is not clear that any North Carolina appellate court has specifically recognized the dry sand portion of our ocean beaches as subject to public trust rights. In
 
 Concerned Citizens,
 
 this Court, in
 
 dicta,
 
 discussed the public trust doctrine relative to privately owned property in the following manner:
 

 Finally, we note that in its joint brief plaintiffs and plaintiff-intervenor rely heavily on the "public trust doctrine." They argue that holding our State's beaches in trust for the use and enjoyment of all our citizens would be meaningless without securing public access to the beaches. However, plaintiffs cite no North Carolina case where the public trust doctrine is used to acquire additional rights for the public generally at the expense of private property owners. We are not persuaded that we should extend the public trust doctrine to deprive individual property owners of some portion of their property rights without compensation.
 

 Concerned Citizens v. Holden Beach Enterprises,
 

 95 N.C.App. 38
 
 , 46,
 
 381 S.E.2d 810
 
 , 815 (1989) (
 
 Concerned Citizens I
 
 )
 
 , rev'd,
 

 Concerned Citizens v. Holden Beach Enterprises,
 

 329 N.C. 37
 
 ,
 
 404 S.E.2d 677
 
 (1991).
 

 *196
 
 However, our Supreme Court reversed this Court's opinion in
 
 Concerned Citizens
 
 on different grounds and expressly disavowed the above
 
 dicta:
 

 We note dicta in the Court of Appeals opinion to the effect that the public trust doctrine will not secure public access to a public beach across the land of a private property owner.
 
 Concerned Citizens v. Holden Beach Enterprises,
 

 95 N.C.App. at 46
 
 ,
 
 381 S.E.2d at 815
 
 . As the statement was not necessary to the Court of Appeals opinion, nor is it
 
 *92
 
 clear that in its unqualified form the statement reflects the law of this state, we expressly disavow this comment.
 

 Concerned Citizens v. Holden Beach Enterprises,
 

 329 N.C. 37
 
 , 55,
 
 404 S.E.2d 677
 
 , 688 (1991) (
 
 Concerned Citizens II
 
 ).
 

 We acknowledge both the long-standing customary right of access of the public to the dry sand beaches of North Carolina
 
 [2]
 
 as well as current legislation mandating such.
 
 See
 
 N.C. Gen.Stat. § 77-20. It is unclear from prior North Carolina appellate opinions whether the common law doctrine of custom is recognized as an independent doctrine in North Carolina, or whether long-standing "custom" has been used to help determine where and how the public trust doctrine might apply in certain circumstances. The General Assembly apparently considers "custom" as a factor in determining the reach of public trust rights in North Carolina.
 
 See
 
 N.C. Gen.Stat. § 77-20(d). Our Attorney General, at least in 1996, was of the opinion that the doctrine of custom operated to preserve public access to North Carolina's dry sand beaches.
 
 Advisory Opinion,
 

 1996 WL 925134
 
 , *2. In any event, we take notice that public right of access to dry sand beaches in North Carolina is so firmly rooted in the custom and history of North Carolina that it has become a part of the public consciousness. Native-born North Carolinians do not generally question whether the public has the right to move freely between the wet sand and dry sand portions of our ocean beaches. Though some states, such as Plaintiffs' home state of New Jersey, recognize different rights of access to their ocean beaches, no such restrictions have traditionally been practiced in North Carolina.
 
 See
 
 Kalo,
 
 The Changing Face of the Shoreline,
 
 78 N.C. L. Rev. at 1876-77 ("[O]ut-of-state buyers came from areas with different customs and legal traditions. Many of these buyers came from states, like New Jersey, where dry sand beaches were regarded as private or largely private. Consequently, many of them brought their expectations of privacy with them to North Carolina. The customs and traditions of North Carolina, however, are not necessarily those of New Jersey, Virginia, or Massachusetts.").
 

 N.C. Gen.Stat. § 77-20 establishes that some portion, at least, of privately-owned dry sand beaches are subject to public trust rights.
 

 *93
 
 Lacking further guidance from prior opinions of our appellate courts, we must determine the geographic boundary of public trust rights on privately-owned dry sand beaches. We adopt the test suggested in N.C. Gen.Stat. § 77-20(e) : "Natural indicators of the landward extent of the ocean beaches include, but are not limited to, the first line of stable, natural vegetation; the toe of the frontal dune; and the storm trash line."
 
 Id.
 
 We adopt this test because it most closely reflects what the majority of North Carolinians understand as a "public" beach.
 
 See, e.g.,
 
 Joseph J. Kalo,
 
 The Changing Face of the Shoreline: Public and Private Rights to the Natural and Nourished Dry Sand Beaches of North Carolina,
 

 78 N.C. L. Rev. 1869
 
 , 1877 (2000) ("the custom of the dry sand beaches being open to public trust uses has a long history in North Carolina"). We hold that the "ocean beaches" of North Carolina include both the wet sand beaches-generally, but not exclusively, publically
 
 *197
 
 owned-and the dry sand beaches-generally, but not exclusively, privately owned.
 

 For the purposes of N.C. Gen.Stat. § 77-20, the landward boundary of North Carolina ocean beaches is the discernable reach of the "storm" tide. This boundary represents the extent of semi-regular submersion of land by ocean waters sufficient to prevent the seaward expansion of frontal dunes, or stable, natural vegetation, where such dunes or vegetation exist. Where both frontal dunes and natural vegetation exist, the high water mark shall be the seaward of the two lines. Where no frontal dunes nor stable, natural vegetation exists, the high water mark shall be determined by some other reasonable method, which may involve determination of the "storm trash line" or any other reliable indicator of the mean regular extent of the storm tide. The ocean beaches of North Carolina, as defined in N.C. Gen.Stat. § 77-20(e) and this opinion, are subject to public trust rights unless those rights have been expressly abandoned by the State.
 
 See
 

 Gwathmey,
 

 342 N.C. at 304
 
 ,
 
 464 S.E.2d at 684
 
 .
 

 The limits of the public's right to use the public trust dry sand beaches are established through appropriate use of the State's police power. As the United States Supreme Court has stated:
 

 Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our "takings" jurisprudence, which has traditionally been guided by the
 
 *94
 
 understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power."
 

 Lucas v. South Carolina Coastal Council,
 

 505 U.S. 1003
 
 , 1027,
 
 112 S.Ct. 2886
 
 , 2899,
 
 120 L.Ed.2d 798
 
 , 820 (1992) (citations omitted).
 

 The right to prevent the public from enjoying the dry sand portion of the Property was never part of the "bundle of rights" purchased by Plaintiffs in 2001. Because Plaintiffs have no right to exclude the public from public trust beaches, those portions of the Ordinances regulating beach driving,
 
 [3]
 
 even if construed as ordinances "allowing" beach driving, cannot effectuate a Fifth Amendment taking.
 

 IV.
 

 We must next determine whether the Town, pursuant to public trust rights or otherwise, may enforce ordinances reserving unimpeded access over portions of Plaintiffs' dry sand beach without compensating Plaintiffs. We hold, on these facts, that it may.
 

 Public trust rights in Plaintiffs' property are held by the State concurrently with Plaintiffs' rights as property owners. Though the Town may prevent Plaintiffs from denying the public access to the dry sand beach portion of the Property for certain activities, that does not automatically establish that the Town can prevent, regulate, or restrict other specific uses of the Property by Plaintiffs without implicating the Takings Clause of the Fifth Amendment to the United States Constitution:
 

 The Takings Clause-"nor shall private property be taken for public use, without just compensation," U.S. Const. Amdt. 5-applies as fully to the taking of a landowner's [littoral] rights as it does to the taking of an estate in land. Moreover, though the classic taking is a transfer of property to the State or to another private party by eminent domain, the Takings Clause applies to other state actions
 
 *95
 
 that achieve the same thing. Thus, when the government
 
 *198
 
 uses its own property in such a way that it destroys private property, it has taken that property. Similarly, our doctrine of regulatory takings "aims to identify regulatory actions that are functionally equivalent to the classic taking."
 

 Stop the Beach,
 

 560 U.S. at 713
 
 ,
 
 130 S.Ct. at 2601
 
 ,
 
 177 L.Ed.2d at 195
 
 (citations omitted).
 

 As Plaintiffs acknowledge: "Takings tests vary depending on whether the challenged imposition is a physical invasion of property or a regulatory restriction on the use of property." "In
 
 Lucas
 
 [
 
 v. South Carolina Coastal Council,
 

 505 U.S. 1003
 
 ,
 
 112 S.Ct. 2886
 
 ,
 
 120 L.Ed.2d 798
 
 (1992) ], the [United States Supreme] Court established two categories of regulatory action that require a finding of a compensable taking: regulations that compel physical invasions of property and regulations that deny an owner all economically beneficial or productive use of property."
 
 King v. State of North Carolina,
 

 125 N.C.App. 379
 
 , 385,
 
 481 S.E.2d 330
 
 , 333 (1997) (citation omitted). Plaintiffs argue on appeal that the contested ordinances violate the "physical invasions" prong of
 
 Lucas
 
 and
 
 King,
 
 and therefore effect a
 
 per se
 
 taking. Plaintiffs do not argue that the contested ordinances constitute a regulatory taking.
 

 A.
 

 Plaintiffs cannot establish that the contested beach driving ordinances
 
 [4]
 
 constitute physical invasion of the Property for purposes of the Takings Clause. The majority of Plaintiffs' argument is predicated on Plaintiffs' contention that the dry sand portion of the Property is not encumbered by public trust rights. We have held that the dry sand portion of the Property is so encumbered. Because public beach driving across the Property is permissible pursuant to public trust rights, regulation of this behavior by the Town does not constitute a "taking."
 

 Plaintiffs have never, since they purchased the Property in 2001, had the right to exclude public traffic, whether pedestrian or vehicular, from the public trust dry sand beach portions of the Property. The Town has the authority to both ensure public access to its ocean beaches, and to impose appropriate regulations pursuant to its police power.
 
 See
 

 Fabrikant,
 

 174 N.C.App. at 41
 
 ,
 
 621 S.E.2d at
 
 27 ;
 
 see also
 

 Kirby v. N.C. Dep't of Transp.,
 
 --- N.C.App. ----, ----,
 
 769 S.E.2d 218
 
 , 230 (2015),
 
 disc. rev. allowed,
 
 - -- N.C. ----,
 
 775 S.E.2d 829
 
 (2015) ;
 
 Slavin v. Town of Oak
 

 *96
 

 Island,
 

 160 N.C.App. 57
 
 ,
 
 584 S.E.2d 100
 
 (2003). The contested beach driving portions of the Ordinances do not create a right of the public relative to the Property; they regulate a right that the public already enjoyed.
 
 See also, e.g.,
 
 N.C. Gen.Stat. § 160A-308 (2013) ("A municipality may by ordinance regulate, restrict and prohibit the use of dune or beach buggies, jeeps, motorcycles, cars, trucks, or any other form of power-driven vehicle specified by the governing body of the municipality on the foreshore, beach strand and the barrier dune system. .... Provided, a municipality shall not prohibit the use of such specified vehicles from the foreshore, beach strand and barrier dune system by commercial fishermen for commercial activities.").
 

 B.
 

 Plaintiffs also contest Section 5-102 of the 2010 Ordinances and Section 5-19 of the 2013 Ordinances. Section 5-102 prohibits any beach equipment "within an area twenty ... feet seaward of the base of the frontal dunes at any time, so as to maintain an unimpeded vehicle travel lane for emergency services personnel and other town personnel providing essential services on the beach strand." Emerald Isle Code of Ordinances § 5-102 (Jan. 2010). Plaintiffs argue that the beach equipment ordinance prevents them from "station[ing] any beach gear in the strip of land near the dunes during May-September (and many other times) due to the passing of Town vehicles, and for the same reason (and due to the ruts left by the vehicles) they can barely walk on the land."
 

 *199
 
 The 2013 Ordinances include the following provisions related to beach equipment:
 

 Sec. 5-19. Restricted placement of beach equipment.
 

 a) In order to provide sufficient area for unimpeded vehicle travel by emergency vehicles and town service vehicles on the public trust beach area, no beach equipment, including beach tents, canopies, umbrellas, awnings, chairs, sporting nets, or other similar items shall be placed:
 

 1. Within an area twenty (20) feet seaward of the base of the frontal dunes on the public trust beach area;
 

 2. Within the twenty (20) feet travel lane on the public trust beach areas that extends from any vehicle access ramp.
 

 b) The requirements of subsection a) shall apply only between May 1 and September 14 of each year, and
 
 *97
 
 emergency vehicles and town service vehicles shall only utilize said areas when no safe alternative vehicle travel area is available elsewhere on the public trust beach area.
 

 c) In order to promote the protection of threatened and/or endangered sea turtles, no beach equipment, including beach tents, canopies, umbrellas, awnings, chairs, sporting nets, or other similar items shall be placed within twenty (20) feet of any sea turtle nest.
 

 d) Violations of this section shall subject the offender to a civil penalty of fifty dollars ($50.00).
 

 Emerald Isle Code of Ordinances § 5-19 (Oct. 2013). We have already held that the public, including the Town, has the right to drive on public trust beaches. This right may be regulated, within the Town's limits, through the Town's police power. Therefore, no part of Section 5-19 of the 2013 Ordinances
 
 [5]
 
 "allowing" or regulating driving on the dry sand portion of the Property can constitute a taking.
 

 As our Supreme Court has noted:
 

 "The question of what constitutes a taking is often interwoven with the question of whether a particular act is an exercise of the police power or the power of eminent domain. If the act is a proper exercise of the police power, the constitutional provision that private property shall not be taken for public use, unless compensation is made, is not applicable." "The state must compensate for property rights taken by eminent domain; damages resulting from the exercise of the police power are noncompensable."
 

 Barnes v. Highway Commission,
 

 257 N.C. 507
 
 , 514,
 
 126 S.E.2d 732
 
 , 737-38 (1962) (citations omitted). Further:
 

 "What distinguishes eminent domain from the police power is that the former involves the
 
 taking
 
 of property because of its need for the public use while the latter involves the
 
 regulation
 
 of such property to prevent its use thereof in a manner that is detrimental to the public interest." "The police power may be loosely described as the power of the sovereign to prevent persons under its jurisdiction from
 
 *98
 
 conducting themselves or using their property to the detriment of the general welfare." "The police power is inherent in the sovereignty of the State. It is as extensive as may be required for the protection of the public health, safety, morals and general welfare." "Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly-populated community, the enjoyment of private and social life, and the beneficial use of property."
 

 [T]he police power[ ] [is] the power vested in the Legislature by the Constitution, to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the Commonwealth, and of the subjects of the same.
 

 "Laws and regulations of a police nature ... do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner." " 'Regulation'
 

 *200
 
 implies a degree of control according to certain prescribed rules, usually in the form of restrictions imposed on a person's otherwise free use of the property subject to the regulation."
 

 Kirby,
 
 --- N.C.App. at ----,
 
 769 S.E.2d at 229-30
 
 (citations omitted). The only "physical invasion" of the Property arguably resulting from Section 5-19 is Town vehicular traffic. However, we have held that Town vehicular traffic is allowed pursuant to the public trust doctrine and, therefore, cannot constitute a taking.
 

 Within Plaintiffs' argument that the contested Ordinances constitute a physical invasion of the Property, Plaintiffs contend that if this Court determines that public trust rights apply to the dry sand portion of the Property, we should still find a taking has occurred. Plaintiffs argue that the beach equipment regulation "imposed new and excessive burdens on an existing easement, without compensation." However, Plaintiffs do not argue that the beach equipment restrictions are an invalid use of the Town's police power. Plaintiffs cite to no authority in support of their argument that imposing certain restrictions on the placement of beach equipment, which might result in occasional or even regular diversion of beach traffic on the Property, could constitute an invalid use of the police power. Nor do Plaintiffs argue or demonstrate that the ordinance
 
 *99
 
 "is so unreasonable or arbitrary as virtually to deprive a person of the complete use and enjoyment of his property, [so that] it comes within the purview of the law of eminent domain."
 
 Kirby,
 
 --- N.C.App. at ----,
 
 769 S.E.2d at 230
 
 (citation omitted). Plaintiffs also fail to "show that [the] regulation deprives the owner of all economically beneficial or productive use of the land [.]"
 
 Piedmont Triad Reg'l Water Auth. v. Unger,
 

 154 N.C.App. 589
 
 , 592,
 
 572 S.E.2d 832
 
 , 835 (2002),
 
 see also
 

 Slavin,
 

 160 N.C.App. 57
 
 ,
 
 584 S.E.2d 100
 
 . In fact, Plaintiffs make no argument implicating regulatory takings jurisprudence.
 

 Assuming,
 
 arguendo,
 
 Plaintiffs argued that a regulatory taking had occurred, this argument would fail.
 

 Land-use regulations are ubiquitous and most of them impact property values in some tangential way-often in completely unanticipated ways. Treating them all as
 
 per se
 
 takings would transform government regulation into a luxury few governments could afford. By contrast, physical appropriations are relatively rare, easily identified, and usually represent a greater affront to individual property rights. "This case does not present the 'classi[c] taking' in which the government directly appropriates private property for its own use," instead the interference with property rights "arises from some public program adjusting the benefits and burdens of economic life to promote the common good[.]"
 

 Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,
 

 535 U.S. 302
 
 , 324-25,
 
 122 S.Ct. 1465
 
 , 1479-80,
 
 152 L.Ed.2d 517
 
 , 541-42 (2002) (citations omitted). The United States Supreme Court then went on to state:
 

 [E]ven though multiple factors are relevant in the analysis of regulatory takings claims, in such cases we must focus on "the parcel as a whole":
 

 " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole[.]"
 

 *100
 
 This requirement that "the aggregate must be viewed in its entirety" ... clarifies why restrictions on the use of only limited portions of the parcel, such as setback ordinances, ... were not considered regulatory takings. In each of these cases, we affirmed that "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking."
 

 Id.
 

 at 327
 
 ,
 
 122 S.Ct. at 1481
 
 ,
 
 152 L.Ed.2d at 543
 
 (citations omitted). Plaintiffs fail to forecast evidence that the regulation restricting certain uses of a portion of the Property could rise to the level of a taking of the entire Property.
 

 *201
 
 We note that our General Assembly has addressed the specific issue of regulating beach equipment on North Carolina ocean beaches in legislation that became effective on 23 August 2013. N.C. Gen.Stat. § 160A-205, entitled "Cities enforce ordinances within public trust areas," states:
 

 (a) Notwithstanding the provisions of G.S. 113-131 or any other provision of law, a city may, by ordinance, define, prohibit, regulate, or abate acts, omissions, or conditions upon the State's ocean beaches and prevent or abate any unreasonable restriction of the public's rights to use the State's ocean beaches. In addition, a city may, in the interest of promoting the health, safety, and welfare of the public, regulate, restrict, or prohibit the placement, maintenance, location, or use of equipment, personal property, or debris upon the State's ocean beaches. A city may enforce any ordinance adopted pursuant to this section or any other provision of law upon the State's ocean beaches located within or adjacent to the city's jurisdictional boundaries to the same extent that a city may enforce ordinances within the city's jurisdictional boundaries. A city may enforce an ordinance adopted pursuant to this section by any remedy provided for in G.S. 160A-175. For purposes of this section, the term "ocean beaches" has the same meaning as in G.S. 77-20(e).
 

 (b) Nothing in this section shall be construed to (i) limit the authority of the State or any State agency to regulate the State's ocean beaches as authorized by G.S. 113-131, or common law as interpreted and applied by the courts of this State; (ii) limit any other authority granted to cities by the State to regulate the State's ocean beaches; (iii)
 

 *101
 
 deny the existence of the authority recognized in this section prior to the date this section becomes effective; (iv) impair the right of the people of this State to the customary free use and enjoyment of the State's ocean beaches, which rights remain reserved to the people of this State as provided in G.S. 77-20(d) ; (v) change or modify the riparian, littoral, or other ownership rights of owners of property bounded by the Atlantic Ocean; or (vi) apply to the removal of permanent residential or commercial structures and appurtenances thereto from the State's ocean beaches.
 

 N.C. Gen.Stat. § 160A-205 (2013). This provision is found in Chapter 160A, Article 8-"Delegation and Exercise of the General Police Power." The 2013 Ordinances were adopted subsequent to the effective date of this legislation.
 

 We hold that passage of Section 5-102 of the 2010 Ordinances, and Section 519 of the 2013 Ordinances, constituted legitimate uses of the Town's police power. We hold that the regulation of the use of certain beach equipment, on public trust areas of the ocean beaches within the Town's jurisdiction, to facilitate the free movement of emergency and service vehicles, was " 'within the scope of the [police] power[.]' "
 
 Finch v. City of Durham,
 

 325 N.C. 352
 
 , 363,
 
 384 S.E.2d 8
 
 , 14 (1989) (citation omitted). Further, the " 'means chosen to regulate,' " prohibiting large beach equipment within a twenty-foot-wide strip along the landward edge of the ocean beach, were " 'reasonable.' "
 

 Id.
 

 (citation omitted).
 

 C.
 

 The contested provisions in the 2010 Ordinances and the 2013 Ordinances did not result in a "taking" of the Property. First, though Plaintiffs argue that the Ordinances deprived them of "the right to control and deny access to others," as discussed above, it is not the Ordinances that authorize public access to the dry sand portion of the Property; public access is permitted, and in fact guaranteed, pursuant to the associated public trust rights.
 
 See
 

 Fabrikant,
 

 174 N.C.App. at 41
 
 ,
 
 621 S.E.2d at 27
 
 . The Ordinances restrict and regulate certain public and private uses pursuant to the Town's police power. The Town's reservation of an obstruction-free corridor on the Property for emergency use constitutes a greater imposition on Plaintiffs' property rights, but does not rise to the level of a taking.
 

 Though Plaintiffs argue that "the Town has made it impossible for [them] to make any meaningful use of the dry [sand] [P]roperty[,]"
 

 *102
 
 Plaintiffs retain full use of, and rights
 
 *202
 
 in, the majority of the Property.
 
 Tahoe-Sierra,
 

 535 U.S. at 327
 
 ,
 
 122 S.Ct. at 1481
 
 ,
 
 152 L.Ed.2d at 543
 
 . Plaintiffs' rights in the dry sand portion of all but the twenty-foot-wide strip of the Property are the same as when they purchased the Property.
 

 Id.
 

 Concerning the twenty-foot-wide strip, Plaintiffs retain all the rights they had when they purchased the Property other than the right to use large beach equipment on that portion of the Property "between May 1 and September 14 of each year." The Town, along with the public, already had the right to drive on dry sand portions of the Property before Plaintiffs purchased it. We affirm the judgment of the trial court.
 

 AFFIRMED.
 

 Judges ELMORE and DAVIS concur.
 

 [1]
 

 This time period is used because there is " 'a periodic variation in the rise of water above sea level having a period of 18.6 years [.]' "
 

 Id.
 

 [2]
 

 Though the issue of historical right of public access to the dry sand beaches was not fully argued below, and is not extensively argued on appeal, it is unchallenged that the Town had allowed public access on privately-owned dry sand beaches since its incorporation. The statement of our General Assembly that the "public ha[s] made frequent, uninterrupted, and unobstructed use of the full width and breadth of the ocean beaches of this State from time immemorial," N.C. Gen.Stat. § 77-20(d), is also uncontested by Plaintiffs.
 
 See also
 
 N.C. Gen.Stat. § 113A-134.1(b) ; N.C. Gen.Stat. § 146-6(f).
 

 [3]
 

 Sections 5-21 through 5-32 of the 2010 Ordinances, and Sections 5-1 and 5-60 through 5-64 of the 2013 Ordinances.
 

 [4]
 

 Sections 5-21 through 5-32 of the 2010 Ordinances, and Sections 5-1 and 5-60 through 5-64 of the 2013 Ordinances.
 

 [5]
 

 We will analyze Section 5-19 of the 2013 Ordinances, but our analysis applies to Section 5-102 of the 2010 Ordinances as well.